**ROSE CONFECTIONS, INC., Appellee,**

v.

**AMBROSIA CHOCOLATE COMPANY, A DIVISION OF W.R. GRACE AND CO., Appellant.**

Nos. 86–5011, 86–5079.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1986.

Decided April 13, 1987.

Rehearing Denied May 12, 1987.

Randolph S. Sherman, New York City, for appellant.

Phillip A. Cole, Minneapolis, Minn., for appellee.

Before McMILLIAN, ARNOLD, and WOLLMAN, Circuit Judges.

ARNOLD, Circuit Judge.

This is a price-discrimination case under section 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a). The jury found that Ambrosia Chocolate Co. violated the Act, and it awarded plaintiff Rose Confections, Inc., $545,500 in damages. The District Court trebled the damages under section 4 of the Clayton Act, 15 U.S.C. § 15, and entered judgment against Ambrosia for $1,636,500. After the District Court denied Ambrosia's motion for a new trial or judgment n.o.v., Rose Confections moved for $340,812.49 in attorney's fees and costs under section 4; the District Court awarded $195,852.99. In No. 86–5011 Ambrosia appeals from the judgment and from the denial of its motion for a new trial or judgment n.o.v., and in No. 86–5079 it appeals from the award of fees and costs. We affirm the jury's finding of liability under the Robinson-Patman Act, but we reverse the judgment and remand for a new trial on damages. Of the two damages theories Rose Confections presented at trial, one was erroneous as a matter of law because it assumed that Rose received the same price that it claimed, and the jury found, to be discriminatory. A correct theory would have been based, instead, on an assumption that neither Rose nor its favored competitor had received a price concession from Ambrosia. Since we reverse the judgment and remand for a new trial on damages, we also reverse the award of attorney's fees and costs and remand for redetermination in light of the additional proceedings.

## I.

Ambrosia, the nation's largest manufacturer of cocoa-based products at the time of trial, makes a wide range of chocolate products at plants in Milwaukee, Wisconsin, Newark, New Jersey, and Charlotte, North Carolina. Tr. VI:538. We are concerned with only one of its products—chocolate chips. Ambrosia sells chips to industrial customers for use as ingredients in other products, such as ice cream and baked goods, and to "rebaggers," who package bulk chips in 12–18 ounce bags and sell them to retailers, such as grocery chains. Rose Confections is a rebagger located in Plymouth, Minnesota. It sells rebagged chips under its own "control" label, "Log House" (which is the company's present corporate name), and under the "private" labels of many of its retail customers, such as Jewel Foods in Chicago. Tr. II:65. Barg & Foster, one of Rose Confections' primary competitors in the private-label market, is a rebagger with facilities originally in Milwaukee. Before 1980, both Rose Confections and Barg & Foster bought the great majority of their bulk chips from Ambrosia.

The product market here is the market in rebagged, private-label chocolate chips. Rebagging private-label chips is essentially a process of buying bulk chips from a manufacturer, making cellophane bags bearing the retailer's private label, and sealing the chips in the bags. The most significant direct costs of production are the cost of the bulk chips, the cost of transporting them from the manufacturer to the rebagging facility (called "freight in"), and the cost of transporting the finished product from the plant to the retail customer (called "freight out"). Tr. II:127. Thus a rebagger has a competitive advantage over other rebaggers if it is located close to its source of supply or close to its retail customer, so that it can eliminate these freight costs. Tr. II:91–92; III:215. Similarly, a chocolate-chip manufacturer has a competitive advantage over other manufacturers if it is located near rebaggers who sell in high-volume markets. In addition to freight savings, having a plant near the customer enables a seller, either a manufacturer selling to a rebagger, or a rebagger selling to a retailer, to provide better service and to fill orders more quickly, both of which are important factors in the private-label chip market. Tr. VI:540–41; III:224.

The geographic market involved is the West Coast of the United States, which, the parties agree, includes California, Oregon, Washington, Nevada, and Arizona. Before 1980, Ambrosia, Rose Confections, and Barg & Foster each sold their products, with varying degrees of success, in the West Coast. Ambrosia had a strong position in the markets near its plants in the Midwest, Southeast, and East Coast, but it was in a "precarious" position in the West Coast market because it did not have a manufacturing location there. Addendum to Appellant's Brief ("Add."), at A14.2; Tr. VI:538–41. In 1980 it decided to "buy" sales on the West Coast by reducing its prices to West Coast customers, with the goal of raising its West Coast sales to a volume that would justify building a manufacturing plant there. Add. at A14.2; Tr. VI:542–43. The price reduction took the form of a "freight absorption"; on sales to West Coast customers from its Milwaukee plant, Ambrosia would charge the same price that it charged other buyers, but it would deliver the product for free to the customers' West Coast facilities. On sales to other buyers, the buyers had to pay for shipping. Ambrosia called this strategy its "West Coast project," and it made this offer to three West Coast customers during 1980 and early 1981. Tr. VI:607–10. None of these, however, was a rebagger.

In spring 1981, Ambrosia approached Barg & Foster with the proposal that is at the center of this lawsuit: If Barg & Foster would build a rebagging plant on the West Coast, Ambrosia would sell Barg & Foster chips under the terms of the "West Coast project." Joint Appendix ("J.A.") at 7. By contrast, its existing supply contracts with Barg & Foster and Rose Confections called for delivery F.O.B. Ambrosia's Milwaukee plant, with no option for delivery to the buyer's plant. Tr. III:278. Under this new agreement, Barg & Foster

established a rebagging plant at Sparks, Nevada and took delivery of more than 5 million pounds of freight-free chips there between July 1981 and October 1983.[1] Ambrosia never offered a similar deal to Rose Confections. As a result, Rose Confections competed directly against Barg & Foster in the West Coast private-label market for more than two years while at a two-pronged competitive disadvantage. First, Rose Confections had to pay freight-in costs from Milwaukee to Plymouth, while Barg & Foster did not have any freight-in costs at its Sparks plant. The freight savings to Barg & Foster amounted to about $1 per case of finished product, or $309,609.48 in all. Tr. III:215, 275; J.A. at 10.3. Second, Rose Confections had higher freight-out costs from Plymouth to its West Coast customers than did Barg & Foster, which could ship from Sparks.

Rose Confections brought its Robinson-Patman action against Ambrosia, but not Barg & Foster, alleging that the free-freight arrangement was an illegal price discrimination that injured secondary-line competition between Rose Confections and Barg & Foster in the West Coast market. After a jury trial over the course of two weeks, the jury returned a damages verdict in favor of Rose Confections.

Ambrosia attacks the judgment and the award of fees and costs on many different fronts. In the next two parts of the opinion, we discuss the issues relating to liability under the Robinson-Patman Act. We affirm on those issues. Then we discuss the issue on which we reverse and remand for a new trial, Rose Confections' damages under section 4 of the Clayton Act. Finally, we discuss the award of attorney's fees and costs.

## II.

To establish liability under the Robinson-Patman Act, one of the elements that plaintiff must demonstrate is a reasonable possibility that the price discrimination may substantially injure competition. This burden may be met in two ways. First, plaintiff may introduce direct evidence that disfavored competitors lost sales or profits as a result of the discrimination. See *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 437–38, 103 S.Ct. 1282, 1290, 75 L.Ed.2d 174 (1983). Second, he can show that the favored competitor received a substantial price reduction over a substantial period of time, which gives rise to a permissible inference of competitive injury. *FTC v. Morton Salt Co.*, 334 U.S. 37, 50–51, 68 S.Ct. 822, 830–31, 92 L.Ed. 1196 (1948). Ambrosia argues that Rose Confections' evidence fails under either standard. We disagree.

### A.

There was direct evidence at trial that Rose Confections lost profits and sales as a result of the freight absorption. Rose Confections' president, Alan Kasdan, testified that his company had to reduce prices to its customers on the West Coast in response to low-price offers made by Barg & Foster.[2] Its West Coast sales broker, John

1. The agreement was reached in April 1981 and was originally to last until the end of 1982. J.A. at 7. Later, Ambrosia and Barg & Foster agreed to include this provision in all unfilled orders that had been placed after January 1, 1981, which in effect made the agreement retroactive to that time. Tr. III:277–78. On September 22, 1982, Ambrosia extended the agreement through July 31, 1983. J.A. at 9. The last free-freight delivery to Sparks from Ambrosia was on October 3, 1983. J.A. at 10.3.

2. Mr. Kasdan testified on direct examination:
Q: After [Barg & Foster's Sparks plant became operational], did you become aware of any change, or price pressure, I should say, in competition with Barg and Foster in the West Coast?
A: Yes.
Q: When was the first time?
A: In the fall of '81, I began to receive calls from my brokers and customers, telling me that there were extremely competitive prices being offered by Barg and Foster.
Q: When you got that information, what did you do?
A: I called [the] Ambrosia sales manager that handled Barg and Foster and us.
Q: What did you say ... when you called him?
A: I told him I was receiving extreme competition from Barg and Foster on the West Coast, and I didn't understand it, because they were selling at prices so low that it appeared to be they were selling below my cost. I

Pfeifer, testified by deposition that Rose Confections lowered its price to one of its longstanding West Coast clients, Ralph's Supermarket, as a result of price competition from Barg & Foster. Pfeifer Depo. at 14–17. Mr. Kasdan also testified to this price reduction. Tr. II:157–59. There was also testimony that Rose Confections lost potential clients to Barg & Foster because of these lower prices. Mr. Pfeifer stated that Rose Confections unsuccessfully solicited the accounts of Thrifty Drug, Sav-On Drugs, and Fedmart, and, after the solicitations, the stores carried chips prepared by Barg & Foster. Pfeifer Depo. 18–21. In addition, Mr. Kasdan related Rose Confections' extensive, seven-year efforts to obtain the largest West Coast account, Safeway, which he thought it had finally won:

Q: At the time of the first offer, May of 1981, you had the private label account at Safeway?

A: That's correct.

Q: And by the fall of '81, you learned that Barg and Foster had the account?

A: That's correct.

Tr. II:142–43.

Barg & Foster's president during that time, Arlan Kitsis, testified that it submitted a low-price offer, reflecting its freight savings, to Safeway to win the account:

couldn't understand how they could do that....
Tr. II:134–35.
Q: What was happening to prices in the market in terms of the price that you could sell the products for in ... 1981, 1982, '83 ...?
A: Prices were extremely competitive. It was tremendous competitive price pressure.
Q: What do you mean by that?
A: Barg and Foster was extremely competitive on their prices. They are very, very aggressive in going out and offering prices. Ghiradelli pretty much responded the way they normally did. They were sort of passive. And toward the fall of 1982, Ambrosia's Retail Services Division began offering some very competitive prices as well in the California market.
Q: Now, how did these prices square with the pricing formula that you were generally attempting to meet in doing business in the West Coast, ...?

Q: Did you after the Sparks facility was planned and [as] part of your program then attempt to sell the Safeway business?

A: Yes.

Q: And in attempting to sell the Safeway business, did you submit a price to them?

A: Of course.

Q: And did that price which was determined by your company reflect the advantages afforded your company by the freight equalization program given by Ambrosia?

A: I would imagine so.

Q: But it did?

A: How would it not?

Tr. III:216.

 This evidence alone is sufficient to allow a reasonable juror to find competitive injury. Ambrosia argues that this evidence is insufficient to satisfy the competitive-injury requirement for three reasons. First, Mr. Kasdan admitted that Rose Confections did not lose a single sale to Barg & Foster from any of its existing customers (those who had been Rose Confections' clients before the Sparks plant was opened). But it was still sufficient proof of competitive injury for Rose Confections to show that it lowered prices to existing customers and lost *potential* customers as a

A: The prices were more representative of our prices in the Middle West than they were on the West Coast. They were much lower than what they should have been for the freight cost out there.
Q: Did you attempt to remain active and to preserve a position in the West Coast market notwithstanding this price activity?
A: Absolutely.
Q: What did you do?
A: We worked that much harder trying to get new customers, compete. We were forced in many cases to cut our margins and our profit, and sometimes to no margin at all, to retain the business on accounts. And we became much more competitive or aggressive in trying to acquire new accounts.
Q: What happened to your profit margins in sales to the West Coast market during that period ...?
A: Our profit margin diminished during that period....
Tr. II:144–45.

result of the freight absorption.[3] Second, Rose Confections' West Coast market share increased substantially despite the alleged price discrimination, and Ambrosia points to this as proof that there was no competitive injury. The Supreme Court, however, has held that a jury may find competitive injury in spite of an increase in plaintiff's market share during the relevant time. *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 702, 87 S.Ct. 1326, 1335, 18 L.Ed.2d 406 (1967). Finally, Ambrosia argues that Rose Confections' evidence of lost prices shows that it "reduced prices to West Coast customers only on a selective basis, and then only to meet the competition of rebaggers generally," Appellant's Brief at 31, rather than competition from Barg & Foster. It is true that factors other than Barg & Foster's low prices may have led to Rose Confections' price reductions. But to the extent that this is so, it goes only to the amount of damages for which Ambrosia is liable under section 4, not to the showing of competitive injury under section 2(a). So long as there is a discrimination, the effect of which "may be substantially to lessen competition," the section 2(a) requirement is satisfied even though other factors may in fact have contributed to plaintiff's injury. See *Falls City*, 460 U.S. at 437, 103 S.Ct. at 1290. Section 4 protects a Robinson-Patman defendant from liability in damages for an injury that he did not in fact cause. See *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561–63, 101 S.Ct. 1923, 1926–28, 68 L.Ed.2d 442 (1981).

### B.

In addition to presenting direct evidence of competitive injury, Rose Confections also produced evidence to support the *Morton Salt* inference of injury to competition. That inference can be drawn when plaintiff shows that a manufacturer sells goods over time to some customers at a substantially lower price than to competitors of those customers. *Morton Salt*, 334 U.S. at 50–51, 68 S.Ct. at 830–31. Rose Confections put on ample evidence that although Ambrosia charged it and Barg & Foster the same nominal price, for at least two years the price to Barg & Foster included free delivery from Milwaukee to Sparks, while the price to Rose Confections did not include any delivery allowance. This was a cognizable price discrimination,[4] see *Conoco, Inc. v. Inman Oil Co., Inc.*, 774 F.2d 895, 902 (8th Cir.1985), and it was substantial. A schedule of shipments from Ambrosia to Barg & Foster's Sparks facility reveals that Ambrosia paid $309,609.48 to ship over 5.5 million pounds of chips between July 1981 and October 1983. J.A. at 10. In 1982 alone, Rose Confections paid to ship more than 6 million pounds of chips, about 60 per cent. of which were from Ambrosia, Tr. II:108, to its plant. J.A. at 3.18. The jury could reasonably infer competitive injury from this evidence.

Ambrosia argues that the *Morton Salt* inference is impermissible as a matter of law in this case because Rose Confections focused on the wrong price differential—the freight absorption from Milwaukee to Sparks. It contends that the correct price differential is Ambrosia's failure to pay the freight to Plymouth, Minnesota on Rose

---

**3.** Although Ambrosia does not make this claim, it could be argued that Rose Confections' direct evidence of competitive injury shows only injury to a *competitor* (Rose Confections), rather than to competition generally. If so, the evidence would be insufficient, for it is settled that the Robinson-Patman Act guards against injury to competition, not injury to individual competitors. *Henry v. Chloride, Inc.*, 809 F.2d 1334 (8th Cir.1987). But that is not the case here. The record reveals that there was at least one other private-label rebagger who bought chips from Ambrosia and sold on the West Coast and was not offered the freight absorption. Tr. VI:615–17. In this light, we think that Rose Confections' evidence of its own lost sales and profits would support a jury finding that other, similarly-situated rebaggers likely suffered the same injury. This is enough to show that the effect of the price discrimination "may be substantially to lessen competition." 15 U.S.C. § 13(a).

**4.** Ambrosia argues that what it did differed little from a legal uniform-delivered-pricing system, paying freight for all its customers. We disagree. It did not pay any freight for Rose. And the amount of freight it paid for Barg & Foster was greatly increased by Barg & Foster's move to Sparks, which was itself induced by the concession from Ambrosia.

Confections' purchases. Ambrosia claims that the record is bereft of any evidence of this cost, and that there is therefore no basis on which to infer a substantial price discrimination. We reject this contention. *Morton Salt* requires a plaintiff to show only a substantial price difference. Rose Confections satisfied that burden here by showing that Ambrosia paid over $309,000 in freight to Sparks, which reduced by that amount the net price Barg & Foster paid, and neither paid the freight nor granted a commensurate freight allowance to Rose Confections.

Next, Ambrosia argues that, even assuming the evidence was sufficient to support an inference of competitive injury, it rebutted that inference as a matter of law because it proved that Barg & Foster's costs in establishing the Sparks plant more than offset its freight savings.[5] The rebuttal evidence was in essence that Barg & Foster spent more in setting up the Sparks plant during the first year of operation than it realized in freight savings that year. This, Ambrosia argues, establishes that there can be no causal relation between the freight absorption and the lower prices and lost sales about which Rose Confections complains.

We reject this argument. The jury was not constrained to accept Ambrosia's theory. Rose Confections put on evidence that the freight savings in fact totalled $309,-609.48 over 27 months, and the jury could reasonably have found that Barg & Foster's overhead at Sparks did not offset that sum. In any event, even if the evidence had irrefutably shown that Barg & Foster's overhead expenses were greater than its freight savings, we think the jury could still have found competitive injury. To the extent that Ambrosia paid the cost of shipping chips to Sparks, it subsidized a cost of operation that Barg & Foster would otherwise have borne at the Sparks facility.

See, *e.g.*, *Purolator Products, Inc.*, 65 F.T.C. 8 (1964), *aff'd*, 352 F.2d 874 (7th Cir.1965), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 758, 19 L.Ed.2d 837 (1968). Further, the jury could have found that without the freight savings Barg & Foster would not have located a facility at Sparks, but, once located there (through a partial subsidy from Ambrosia), it had a significant competitive advantage over Rose Confections because it was located closer to its West Coast customers and had correspondingly low freight-out costs from Sparks, enabling it to offer lower prices than Rose Confections.

Finally, pointing to another aspect of competition, Ambrosia argues that the overall effect of its freight absorption was to foster, not injure, competition because it helped Barg & Foster establish a new rebagging plant on the West Coast, which resulted in lower prices and better service to retailers there, and left Rose Confections no worse off than it was before. But, assuming the evidence supported this conclusion, it did not negate Rose Confections' evidence, which supported the contrary conclusion. The jury found that the freight absorption might substantially injure competition in the West Coast private-label rebagging market. So long as this was a reasonable interpretation of the conflicting evidence, and we have held that it was, we cannot disturb the jury's finding merely because the evidence could also have supported the opposite conclusion.

### C.

 Ambrosia claims that the District Court erred in not instructing the jury that the *Morton Salt* inference is rebuttable. We reject this contention. The instruction as given adequately informed the jury that it need not draw the *Morton Salt* inference: "If you find a substantial price differential over a substantial period of time

---

5. Barg & Foster expected to incur approximately $147,200 in overhead expenses for the year 1981 in establishing the Sparks facility, Tr. III:221, and there was testimony that it actually spent "in excess of $100,000 dollars." Friedman Depo. at 83–84. It anticipated saving $90,000 in freight costs—both freight-in and freight-out—in 1981. Tr. III:220. There is no evidence of what Barg & Foster actually spent to operate the Sparks plant during the freight absorption. Rose Confections, as noted earlier, introduced evidence that the total freight paid by Ambrosia on shipments to the Sparks plant was $309,-609.48. J.A. at 10.3.

and that Rose and Barg & Foster were in substantial competition you *may* infer that such price differential lessened competition." J.A. 14.15 (emphasis ours). Thus the instruction permitted the jury to find that there was no injury to competition despite Rose Confections' *Morton Salt* evidence.

■ In addition, Ambrosia asserts that there was error in the special verdict form used by the jury. Under Fed.R.Civ.P. 49(a), which provides for the use of special verdicts, the form should require the jury to make a "special written finding upon each issue of fact." Ambrosia claims, and we agree, that the special verdict here did not contain an interrogatory on competitive injury under Section 2(a), which was a disputed issue of fact. We hold, however, that this error is of no consequence now because Ambrosia waived its right to a jury trial on this issue.

Rule 49(a) provides in part:

If in [submitting a special verdict] the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

Ambrosia never specifically requested the District Court to submit a question on competitive injury. It did request the Court "to break out the elements [on the special verdict] and [objected to] the failure to do so." It then objected "more specifically" to the meeting-competition question. Tr. VIII:755. At another point in the record, Ambrosia objected to the District Court that

all essential elements of the cause of action should have a separate special verdict form. Otherwise, the Court is not going to know whether[,] if all of the questions that are answered are answered in Rose's favor, ... you still don't know the answer to the question were

the damages caused by the antitrust violation ...?

\* \* \* \* \* \*

All essential elements have to have their own special verdict form. So we would suggest after [No. 2], which gets to the liability issues, you would have a third to the effect did ... the violation alleged cause damage to the plaintiff?

Tr. VIII:777.

Although Ambrosia made several specific requests to include questions on other omitted issues, it did not do so on the competitive-injury issue. Its requests that "all essential elements" appear on the special verdict were insufficient under Rule 49(a) to preserve this issue, because the Rule makes clear that an objection must be lodged specifically with respect to the particular omitted issue. For a proper objection, see *Huddleston v. Herman & MacLean*, 640 F.2d 534, 550 (5th Cir. Unit A 1981), *rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Because Ambrosia did not demand submission of the competitive-injury question to the jury, we must deem that the District Court, consistent with the jury's verdict, found competitive injury. Thus there is no error on this ground.

### III.

At trial Ambrosia attempted to prove that, even if it had discriminated in prices between Rose Confections and Barg & Foster, it was exonerated from Robinson-Patman liability because it was "meeting competition," as that defense is defined in 15 U.S.C. § 13(b). Its theory was that West Coast manufacturers could make chocolate products for about the same cost as Ambrosia, Tr. VI:547, and had a built-in freight advantage over it. Their purchasers had to pay freight only from their West Coast locations to the purchasers' West Coast plants, whereas Ambrosia's West Coast customers had to pay much higher shipping costs. Ambrosia sought to overcome this disadvantage by absorbing freight on products purchased by West Coast customers.

The District Court let this issue go to the jury, instructing it in part: "To establish this defense, Ambrosia must present, by a preponderance of the evidence, facts to show that lower prices were offered and being made available to Barg & Foster by competitors of Ambrosia prior to the time Ambrosia made its offer as to free freight to Barg & Foster." J.A. 14.16. The jury found that Ambrosia did not lower its prices to meet competition. Ambrosia argues here that the quoted portion of the jury instruction misstated the law with respect to the proof necessary to establish the defense, and that it established the defense as a matter of law. Although we agree that the instruction was erroneous, we hold that Ambrosia's evidence was insufficient, as a matter of law, to prove the defense. Accordingly, we affirm the jury's finding and the District Court's denial of a new trial or judgment n.o.v. on this issue.

### A.

■ The instruction required Ambrosia to show that "lower prices were offered and being made available to Barg & Foster" before the meeting-competition defense was available. This formulation was too restrictive. Section 2(b) of the Robinson-Patman Act, which defines the defense, states:

> [n]othing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price ... was made in good faith to meet an equally low price of a competitor....

15 U.S.C. § 13(b). This language does not call for defendant to show that a lower price had been offered to the favored customer; it calls only for a showing that his lower price was made in good faith to meet a competitor's price. The Supreme Court has consistently interpreted this language to require that defendant show only "the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *FTC v. A.E. Staley Manufacturing Co.*, 324 U.S. 746, 759–60, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945). It is not necessary to show that the competitor's low price has been offered to the favored purchaser to meet this standard. *Id.* at 759, 65 S.Ct. at 977. The meeting-competition defense is a "fact-specific" inquiry, *United States v. United States Gypsum Co.*, 438 U.S. 422, 455, 98 S.Ct. 2864, 2882, 57 L.Ed.2d 854 (1978), which may be satisfied by any proof demonstrating that a reasonable person would have believed that a low-price offer was available to the favored purchaser. See *ibid.* Here, the meeting-competition instruction required Ambrosia to show the existence of a specific, low-price offer from a competitor to Barg & Foster in order to establish the defense, and this was error. Compare *Reserve Supply Corp. v. Owens-Corning Fiberglas*, 639 F.Supp. 1457, 1465–67 (N.D.Ill.1986) (holding the defense established on proof that did not include a specific showing of a low-price offer to the favored purchaser).

### B.

■ It remains for us to examine the record, and, if the evidence was sufficient for a properly instructed jury to find that Ambrosia was meeting competition, we must remand for a new trial on liability. If the evidence was insufficient, we must affirm the judgment as it stands. After carefully reviewing the record in the light most favorable to Ambrosia, we hold that the evidence was insufficient as a matter of law to prove the defense. Accordingly, the instructional error does not warrant a new trial on liability.

Ambrosia introduced evidence that it sold its entire line of chocolate products on the West Coast from its Milwaukee plant. It had been aware for a long time that it was at a two-fold competitive disadvantage with respect to West Coast manufacturers because (1) its West Coast customers had to pay higher freight costs from Milwaukee to their facilities than its competitors' customers paid from their plants, Add. at A14, and (2) Ambrosia could not offer the service that many customers required, such as delivery of product within one or two days of

request. Tr. VI:539–42, 608–09.[6] Ambrosia's solution was to build a manufacturing plant on the West Coast. Tr. VI:538–39. To justify the expense necessary to build the plant, Ambrosia decided to offer West Coast customers free freight on any cocoa-based products they bought from the Milwaukee plant. Tr. VI:543–44, 609–10. This was designed to increase Ambrosia's West Coast sales to the point where building a plant there would be profitable.

Under this project, Ambrosia served three West Coast customers before it made its offer to Barg & Foster: Peter Paul, which had a candy facility in Salinas, California; Nabisco; and ITT Continental, which made Hostess cupcakes and Ding Dongs in Seattle, Washington. Tr. VI:543–44, 593, 608–10. None of these customers was a private-label rebagger. Peter Paul bought liquid coatings from Ambrosia, but it eventually built its own chocolate-manufacturing plant, and Ambrosia lost the account. Tr. VI:543–44. Nabisco bought cocoa products from two West Coast manufacturers in addition to Ambrosia, but apparently was not a rebagger. Tr. VI:610. ITT Continental also bought chocolate coatings rather than bulk chips; Ambrosia lost this account when Continental decided to change from slab coating to liquid-chocolate coating. Ambrosia offered it free delivery of liquid chocolate from Milwaukee (which apparently involved almost prohibitive freight-absorption costs, see Tr. VI:540), but Continental replied that it could not buy from Ambrosia unless Ambrosia had a West Coast plant. Tr. VI:609. An Ambrosia memorandum attributed the loss of the Continental account to the freight costs. Add. at A14.2–3.

It is against this background that Ambrosia claimed that absorbing freight for Barg & Foster was necessary to meet competition from West Coast manufacturers. Ambrosia's president during the freight ab-

sorption, Pedro Mata, testified that West Coast manufacturers could offer low prices to rebaggers because of their freight advantage.

> [T]he net [freight] disadvantage to us would be five cents [per pound]. An operator in the West Coast in the United States can produce chocolate at the same cost that we can produce it, in fact cheaper, because they are on the coast. We have to bring the stuff to Milwaukee from either coast, primarily from the East Coast. The manufacturer then in the West Coast has, in addition to the possible advantage of the raw material not being transported, has the advantage that to his customers in the market he doesn't have to incur the five cents.

Tr. VI:547.

Ambrosia also produced evidence that it thought at least two West Coast chocolate manufacturers were potential suppliers of West Coast private-label rebaggers, Guittard Chocolate and Ghiradelli Chocolate. Tr. VI:580–81. However, this testimony also showed that Ambrosia knew that Guittard and Ghiradelli were "very small relative to us," Tr. VI:580, and probably did not have the capacity to supply the quantity that rebaggers required.

This is the extent of Ambrosia's evidence supporting the meeting-competition defense. We hold that no reasonable juror could have found on this record that Ambrosia believed in good faith that its low price to Barg & Foster was necessary to meet competition in the West Coast private-label rebagging market.

Our conclusion is in part compelled by the nature of Ambrosia's West Coast project. It is evident from the record that the West Coast project was a strategy to increase sales of all of Ambrosia's broad line of chocolate products on the West

---

**6.** The record is quite clear that, with respect to its broad line of products, the service disadvantage was much more harmful to Ambrosia than the price disadvantage. See Tr. VI:539–41, 546–48, 608–09. One witness, Ambrosia's vice-president of sales, testified, "[The problem is] basically supply.... [I]f he does not schedule his production needs accurately or if the truck gets caught in some kind of a snowstorm or flat tire, the customer is out of product. So price is really irrelevant. It doesn't really matter. It was the availability, the timing of the deliveries." Tr. VI:609. Of course, the price disadvantage was a problem to some extent, and, for present purposes, we construe this evidence most strongly in favor of Ambrosia.

Coast to a level at which it could justify investing in a manufacturing facility there. While this may be a laudable corporate policy, and in the long term could have led to increased competition among West Coast chocolate producers, it does not square with the defense of meeting competition as envisioned by Congress and interpreted by the Supreme Court. The defense is designed to enable sellers to make flexible responses to individual competitive situations; it is a rule of economic self-defense which allows a seller to cut his price to one of his customers, who is being tempted by a competitor's low bid, without exposing him to Robinson-Patman liability because he does not cut prices across the board to all of his customers. That situation, however, is a far cry from the present case, in which Ambrosia's freight absorption is a predetermined policy that required a buyer such as Barg & Foster only to qualify as a "West Coast customer" to receive the favorable price. This is not the kind of pricing for which a seller should usually be exonerated from Robinson-Patman liability when, as here, he discriminates in price between competing purchasers. In this regard, we find the words of the Supreme Court instructive:

> [Section] 2(b) does not concern itself with pricing systems or even with all the seller's discriminatory prices to buyers. It speaks only of the seller's "lower" price and of that only to the extent that it is made "in good faith to meet an equally low price of a competitor." The Act thus places emphasis on individual competitive situations, rather than upon a general system of competition.

*FTC v. A.E. Staley,* 324 U.S. at 753, 65 S.Ct. at 974.

This does not mean that defendant could never establish the defense on this kind of record. It is possible that a general pricing policy spanning several different markets in a certain region could be a good-faith response to competition in each of the markets in that region. But when, as here, the plaintiff proves discrimination in one of those markets, we think the evidence must show defendant's good-faith belief that he was meeting competition in that market.

And this is where Ambrosia's proof breaks down.

According to the record, Ambrosia's belief that it was meeting competitors' low prices in the private-label rebagging market was based on two grounds: (1) its experience in other West Coast markets with Peter Paul, Nabisco, and ITT Continental and (2) its supposition that conditions in those markets would hold true for the private-label rebagging market. Aside from this assumption, there was no evidence to establish Ambrosia's belief that competitors could undercut its prices to rebaggers. We accept the fact that Ambrosia held this belief, but we hold that no reasonable juror could have found that it held the belief *in good faith,* as that phrase is used in the present legal context. When defendant's belief is founded on assumption or speculation, the good-faith element of the defense requires that it make some attempt to investigate or verify its belief. See *A.E. Staley,* 324 U.S. at 758, 65 S.Ct. at 976. Ambrosia did not introduce any evidence that it did so before it offered the free-freight deal to Barg & Foster. There is evidence that Ambrosia investigated whether low prices were available in other West Coast markets, but this does not suffice to establish good faith with respect to the rebagging market. There is also evidence that Ambrosia investigated competition in the West Coast rebagging market before it established its own Retail Services Division in 1982 (which competed directly against national rebaggers for private-label accounts), J.A. 2.2–2.42, but this evidence does not show whether the investigation preceded the Barg & Foster deal, or whether it verified that Ambrosia's prices to West Coast rebaggers could be undercut.

The record does contain evidence that bulk chips were available to West Coast rebaggers from Boldeman Chocolate Co. in Union City, California before the offer to Barg & Foster. In 1980 Rose Confections contracted with Boldeman to supply 240,-000 lbs. of chocolate chips because Rose Confections wanted to test Boldeman as a possible source of chips in the event it

established a West Coast rebagging plant. Tr. II:89–91. But this evidence does not show what Boldeman's price was, nor does it support any inference that Boldeman's price was lower than Ambrosia's.

We must affirm the jury's finding of liability under the Robinson-Patman Act because no reasonable juror, properly instructed, could have found that Ambrosia acted in good faith to meet a competitor's low price in the West Coast rebagging market.

### IV.

■ We now turn to the question of damages under section 4 of the Clayton Act. This is a different inquiry from our earlier one, for, in contrast to the Robinson-Patman Act, which predicates liability on a showing that the alleged discrimination may substantially lessen competition, section 4 permits an award of damages only on a "showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co.*, 451 U.S. at 562, 101 S.Ct. at 1927 (citation omitted). The Supreme Court has described the burden of proof of causation under section 4, often referred to as the "fact of damage," in the following terms:

> [I]n the absence of more precise proof, the fact-finder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.

*Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969) (internal quotation and citations omitted), quoted in *J. Truett Payne Co.*, 451 U.S. at 565–66, 101 S.Ct. at 1929. In addition, once the fact of damage has been shown, the burden of showing the precise amount of the injury is eased somewhat because of

> the difficulty of ascertaining business damages as compared, for example, to

damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's anti-trust violation. But our willingness also rests on the principle . . . that it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.

*J. Truett Payne Co.*, 451 U.S. at 566–67, 101 S.Ct. at 1929–30 (internal quotation and citations omitted).

Rose Confections' damages evidence proceeded on two theories: (1) it lost profits on its actual sales because of low prices on the West Coast, which resulted from the price discrimination, and (2) it lost profits on potential sales to customers that it would have obtained absent the violation. Ambrosia claims that this proof was erroneous as a matter of law because it relied on a legally impermissible premise—that Rose Confections would have received the benefit of the discriminatory price given Barg & Foster. As a result, Ambrosia argues, the damages proof shows only what Rose Confections' market position would have been had it shared in the violation, and not, as the law requires, what it would have been absent the violation.

We agree with Ambrosia that part of Rose Confections' proof of damages proceeded on a legally impermissible assumption, but we disagree with Ambrosia on the effect of the error. Since we cannot determine from the verdict whether the jury relied on the erroneous evidence, the damages verdict must be reversed. However, because Rose Confections produced sufficient untainted evidence to support a jury verdict under section 4, we hold that a new trial on damages, rather than a judgment n.o.v., is required.

### A.

Rose Confections had two expert witnesses on damages, an economics professor and an accountant. The professor prepared a "yardstick" analysis, which measured Rose Confections' lost potential sales

in the West Coast by reference to its actual performance in a comparable, violation-free market, here the Midwest market.[7] On this basis, the professor calculated the increased market share that Rose Confections would have had in the West Coast but for the price discrimination. Using this model, the accountant then calculated Rose Confections' marginal costs and profits in producing the additional volume in order to obtain a value for the lost potential sales. In addition, without relying on the yardstick model, the accountant also calculated the amount of Rose Confections' lost profits on actual sales attributable to the price discrimination. This was done by taking the actual price at which Rose Confections sold to its best West Coast customer, Ralph's Supermarket, as the violation-free West Coast price, and determining the difference between Rose Confections' projected profits at that price and its actual profits on West Coast sales.

We agree with Ambrosia that the professor assumed for his yardstick analysis that Rose Confections would have received the benefit of the price discrimination, *i.e.*, free freight to Sparks, Nevada. He testified:

Q: [A]re you telling me that there was such a significant difference in the degree of Rose's vigor in competition, 1980 versus 1981, in the West Coast market that Rose could pick up an additional 11 to 12 percent market share in 1981 simply by more vigorous competition?

A: I believe that it could have, had it received the same freight rates as Barg & Foster, yes.

Tr. of Testimony of W. Bruce Erickson & Howard Kaminsky at 55.

\* \* \* \* \* \*

A: Well, ... once the price difference— if the price difference were extended to all competitors, or if all competitors competed on an even basis, then one would expect that Rose would have obtained a market share similar to that in the Midwest.

*Id.* at 76.

\* \* \* \* \* \*

A: First, had Rose received similar treatment [the freight absorption], it might have had a better chance with respect to Safeway. Second, had it received more favorable treatment, it could have gained customers from other companies.

*Id.* at 120.

■ We also agree with Ambrosia that this assumption was error as a matter of law. Section 4 "is essentially a remedial statute," *J. Truett Payne Co.*, 451 U.S. at 562, 101 S.Ct. at 1927, and, like any damages remedy, the purpose of the statute is to place the antitrust plaintiff as far as possible in the position it would have occupied but for the violation. Thus, any calculation of section 4 damages must strive to approximate a violation-free state of affairs. See, *e.g.*, *Olympia Co. v. Celotex Corp.*, 771 F.2d 888, 892 (5th Cir.1985). The yardstick model did not do this; on the contrary, it assumed that Rose Confections would share in the benefit of the violation. This erroneous premise was reflected in the economist's calculation of lost potential sales and was carried forward into the accountant's calculation of lost profit on those sales.

■ The Robinson-Patman violation here was discriminatory treatment as between two purchasers, and it is suggested that the discrimination, and the violation, could be cured by assuming either that both Rose Confections and Barg & Foster, or neither of them, received the freight absorption. We disagree. This argument might have some merit if Rose Confections and Barg & Foster were the only potential customers of Ambrosia, but here the record is clear that Ambrosia sold chips to at least one other midwest-based private-label re-

---

7. Ambrosia claims that the Midwest and West Coast markets were so different as to make this analysis inadmissible. We disagree. A comparison of two different markets will always be open to the argument that the markets are fundamentally incomparable, like apples and or-

anges. But the Supreme Court has approved the use of a comparison of different markets, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 116 n. 11, 89 S.Ct. 1562, 1573 n. 11, 23 L.Ed.2d 129 (1969), and the differences here were for the jury to weigh.

bagger who sold in the West Coast, Sather Cookie of Round Lake, Minnesota. Tr. VI:615–17; see also Tr. II:165. Even if the discrimination between Rose Confections and Barg & Foster were to disappear if both had received free-freight chips, there would still be price discrimination against Sather Cookie. This state of affairs cannot be said to be violation-free, see *Olympia Co.*, 771 F.2d at 892, and cannot be the basis for an award of damages under section 4. Since we cannot know whether or not the jury based its damages award on the erroneous yardstick evidence, we must reverse the damages verdict.

### B.

 It remains for us to determine whether our reversal of the damages verdict requires that we enter a judgment n.o.v. for Ambrosia or that we send this case back for a new trial on damages. A new trial is necessary if, setting aside the evidence based on the erroneous premise, Rose Confections presented sufficient untainted evidence to support an award of damages under section 4. We hold that it did. Its president and its West Coast broker testified that Ambrosia's freight absorption resulted in lower prices for rebagged chips in the marketplace, and this caused Rose Confections to mark down its chips and lose profits. See *supra* pp. 385–86 & n. 2. Barg & Foster's president testified that his company was able to offer low prices on the West Coast because of the freight absorption. See *supra* pp. 386–87. This testimony was supported by documentary evidence of the prices that Rose Confections actually charged on the West Coast and evidence of a violation-free price for that market.[8] From this evidence the jury

could reasonably and justly infer antitrust injury in the form of lost profits and calculate the amount of damages.

Rose Confections also produced sufficient evidence that it lost potential customers as a result of Ambrosia's price discrimination. Its president testified that in May 1981 he thought his company had the private-label account for Safeway Stores. See *supra* p. 386; Tr. II:142. This was supported by documentary evidence of Rose Confections' negotiations with Safeway, and by other testimony regarding the negotiations. Barg & Foster's president testified that his company acquired the Safeway account in fall 1981, after locating at Sparks, on the basis of a low-price offer made as a result of its freight savings. The jury could infer from this that, but for the freight absorption, Rose Confections would have had the Safeway account.

Ambrosia argues that Rose Confections' failure to obtain the Safeway account after seven years of negotiations, coupled with evidence that Rose Confections' service disadvantage, not its price disadvantage, was the cause of this failure, established as a matter of law that the failure was not a result of the freight absorption. We disagree. The jury was free to reject Ambrosia's evidence and find that the price discrimination was the sole cause of the failure to land the Safeway account. Alternatively, the jury could reasonably have found that Barg & Foster's service advantage, to the extent it caused Rose Confections to lose Safeway as a potential customer, was itself a result of the price discrimination because, absent the freight absorption, Barg & Foster would not have established the Sparks facility. Finally, the jury

8. The violation-free price used by Rose Confections was the price it actually charged to one West Coast customer, Ralph's Supermarket, during the period of the violation. Ambrosia claims that this was an erroneous price for comparison because Rose Confections charged Ralph's a premium price, and it is wrong to assume that, absent the violation, Rose Confections would have been able to charge a premium price in a competitive West Coast market. We reject this argument. Ralph's had been Rose Confections' customer before the price discrimination, and, although Rose Confections

had to reduce its price to Ralph's in the face of Barg & Foster's competitive offer, Rose Confections "did not have to meet the price the competition offered, ... because we had performed, [and] they were satisfied with the quality of the service. We had to reduce our price and get in the ball park, but we didn't have to meet or beat the price on that account." Tr. II:159. The price to Ralph's was not sheltered from competition, but it was insulated to some extent from Barg & Foster's offer. Thus it was a reasonable comparative price.

could have found antitrust injury to the extent that the price discrimination caused Rose Confections to lose the Safeway account, even if there were other causes.[9]

There was also sufficient evidence for the jury to calculate the amount of damages resulting from the loss of potential sales to Safeway. Ambrosia brought out on cross-examination of Barg & Foster's president that the Safeway account "was by far and away the largest single customer served" by Barg & Foster, representing at least 50 per cent. of its total volume. Tr. III:228. The jury could have approximated the amount of Safeway's purchases and, using documents prepared by Rose Confections, calculated Rose Confection's potential costs and profits on that additional volume.[10]

### IV.

■ Finally, we come to the award of attorney's fees and costs, which is the subject of the appeal in No. 86–5079. Since we have partially reversed the underlying judgment, we reverse the award of attorney's fees and costs as well. Rose Confections can move again for its fees and costs on remand, and the District Court will then be in a position to fix a reasonable sum, to be determined in light of the amount of untrebled damages, if any, plaintiff recovers. See *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1274 (8th Cir.), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980).

■ We add one comment relevant to the award before us. Rose Confections moved to recover fees charged by its lead attorney for travel to and from depositions. The District Court permitted recovery for the hours, but allowed only one-half the attorney's usual hourly rate. We have permitted recovery of the full hourly rate for attorney-travel time. *Craik v. Minnesota State University Board*, 738 F.2d 348, 350 (8th Cir.1984) (per curiam). If Rose Confections is entitled to fees and costs after remand, the Court should award fees at the full hourly rate that the lawyer usually commands, unless it determines in its discretion that such a recovery would be unreasonable. Such an award would be unreasonable if, for example, the lawyer did not customarily charge clients for travel time, or if he did not have other work that could have been done during that time had he not been traveling on Rose's business.

### V.

To summarize: We affirm the judgment in part and reverse in part. We affirm the jury's finding of liability under the Robinson-Patman Act. Even though the jury instruction on meeting competition was erroneous, we hold that the error does not require a new trial on that issue because the evidence was insufficient for even a properly-instructed jury to find the defense. We reverse the award of damages under section 4 of the Clayton Act, and remand for a new trial on that issue because there was sufficient non-erroneous evidence for the jury to find damages. On re-trial, Rose Confections will be free to prove all of the profits and sales it allegedly lost as a result of the price discrimination. Finally, we reverse the District

---

9. Having reached this determination, we need not discuss whether Ambrosia's price discrimination caused Rose Confections to lose Fedmart, Sav-On Drugs, and Thrifty Drug as potential accounts, in addition to Safeway. That Rose Confections produced sufficient evidence of lost potential sales is enough to warrant a new trial on this aspect of damages. On re-trial, Rose Confections will be free to prove all of its lost potential sales caused by Ambrosia's price discrimination.

10. Plaintiff's Exhibit 41, J.A. at 3, contains Rose Confections' actual costs and profits for the years 1981 through 1984. It also contains *pro forma* income earnings on projected additional chip sales that were lost as a result of the price

discrimination. The *pro forma* statements are infected with the error that requires a new trial—they assume that the additional chips would have been purchased at a price including free freight to Sparks, Nevada. If this were the only evidence before the jury on which it could have calculated the value of the lost potential sales, we would not deem it sufficient under section 4 to warrant a new trial. However, the jury could also have used the actual income and earnings for those years, which were not infected with error, in determining damages, and that would have been a sufficient calculation under section 4. Therefore Rose Confections did produce sufficient error-free damages evidence to warrant a new trial.

Court's order awarding attorney's fees and costs under section 4; they are to be redetermined after remand if Rose again wins a verdict.

It is so ordered.