# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-2462

_____

| | | |
|---|---|---|
| Reeder-Simco GMC, Inc., | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Volvo GM Heavy Truck Corporation, | * | Western District of Arkansas. |
| now known as Volvo Trucks North | * | |
| America, Inc., | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: April 15, 2003
Filed: July 12, 2004

_____

Before BYE, RICHARD S. ARNOLD, and HANSEN, Circuit Judges.

_____

BYE, Circuit Judge.

Volvo Trucks North America, Inc. (Volvo) appeals from a judgment entered in the district court[1] in favor of Reeder-Simco GMC, Inc. (Reeder) on claims alleging unfair price discrimination under the Robinson-Patman Act (RPA), 15 U.S.C. § 13, and a failure to deal in good faith and in a commercially reasonable manner under the

_____

[1]The Honorable Robert T. Dawson, United States District Court for the Western District of Arkansas.

Arkansas Franchise Practices Act (AFPA), Ark. Code Ann. §§ 4-72-201 through 4-72-209. We affirm.

I

This is an appeal from the denial of a motion for judgment as a matter of law (JAML) following a jury verdict; consequently we recite the evidence in the light most favorable to the verdict holder, Reeder. See Jones v. Swanson, 341 F.3d 723, 731 (8th Cir. 2003).

Reeder sells new and used trucks, including heavy-duty trucks, out of a dealership located in Fort Smith, Arkansas. Volvo manufactures a broad line of heavy-duty trucks for both over-the-road and vocational use (dump trucks, mixer trucks, etc.). In 1995, Reeder signed a franchise agreement with Volvo to become an authorized Volvo truck dealer for a five-year term expiring March 31, 2000. The agreement provided for automatic one-year extensions of the franchise if Reeder met certain sales objectives established unilaterally by Volvo.

The majority of heavy-duty trucks sold by dealers are manufactured only after a retail customer has solicited and accepted bids from several dealers. During this competitive bidding process, dealers seek concessions from Volvo for a price below the initial wholesale price (80% of the published retail price) which then allows the dealers to offer lower prices to their customers. This is an industry-wide practice. To remain competitive with other truck manufacturers, Volvo does not reveal its method of calculating concessions. The crux of this case is Reeder's claim that Volvo gave other dealers more favorable price concessions than Volvo granted Reeder, which concomitantly reduced Reeder's profits on successful bids and increased the number of Reeder's unsuccessful bids.

Reeder filed this action in February 2000 alleging Volvo violated the RPA and AFPA and tortiously interfered with Reeder's contracts. The RPA claim alleged both primary-line and secondary-line violations (explained below). The district court granted Volvo's motion for summary judgment on the alleged primary-line RPA violation and claim for tortious interference. The remaining claims – the secondary-line RPA and AFPA claims – were tried to a jury.

Reeder presented the following evidence at trial. In December 1997, Volvo announced the "Volvo Vision" in an email distributed to its dealers, including Reeder. The email had a list of Volvo's challenges, which included "too many dealers" and "under performing dealers." App. 576. The Volvo Vision called for "fewer dealers, larger markets." Id. The email further indicated Volvo wanted to more than double the average market size of its dealers and decrease the number of dealer owners from 146 to 75.

In March 1998, Volvo held its annual North American Dealer Conference in Marco Island, Florida. Marc Gustavson, a Volvo executive, was the conference's keynote speaker. He elaborated on the Volvo Vision by indicating 50% of current Volvo truck dealers would not be in business in the next few years. Unlike Volvo's past annual dealer conferences, where Volvo featured motivational speakers who got dealers "revved up" to sell more trucks, id. at 1119, the featured guest speaker of the 1998 conference was Jon Krakauer, author of "Into Thin Air: A Personal Account of the Mt. Everest Disaster." Krakauer spoke of falling short of his goal to reach the summit of Mt. Everest and told the dealers sometimes they had to learn to give up without achieving their goals.

Prior to and during this same time frame (1996-1998), Reeder noticed an increase in the sales objectives Volvo expected of it, coupled with a decrease in the pricing concessions it obtained from Volvo. After learning of the Volvo Vision and its stated goal of reducing the number of authorized Volvo dealers, as well as

-3-

mistakenly receiving faxes from Volvo intended for other dealers which listed larger concessions than Reeder was getting, Reeder came to suspect it was one of the dealers Volvo sought to eliminate.

A.    Head-to-Head Competition with Another Dealer for the Same Customer.

Reeder presented evidence that in the summer of 1999, it bid on the sale of twelve trucks to Hiland Dairy Company located in Springfield, Missouri. Reeder requested a 12% concession, but Volvo authorized only 7.5%. Another Volvo authorized dealer, Southwest Missouri Truck Center in Springfield, successfully obtained the Hiland Dairy contract when Volvo granted it an 8.5% concession. As a result of the difference in price concessions, Southwest could offer the Missouri customer a price of $62,890 per truck, while Reeder's price per truck was $63,632.69. Had Reeder obtained the account, it would have realized a gross profit of $30,000 on the sale.

B.    Contemporaneous Sales of Like Grade and Quality Trucks in Which Favored Volvo Dealers Received Greater Price Concessions than Reeder.

In March 1998, Reeder successfully bid on the sale of thirty trucks to Lane Freight located in Tulsa, Oklahoma, involving a mixture of over-the-road day-cab and sleeper-cab trucks. Reeder initially requested a 12.51% concession on this sale. When Volvo denied the request, Reeder asked for a 10% concession on the day-cab trucks and 8.4% on the sleepers. Volvo ultimately granted a 9% concession on both truck types. Two months earlier, Volvo had granted a dealer located in Tyler, Texas, a 12.3% concession on the sale of twelve trucks of like grade and quality to Brookshire Grocery located in Tyler. As a result of the difference in concessions, the price Reeder's customer paid for each truck was $2,606 higher than the price the Texas dealer provided to its customer. Had Volvo offered Reeder the 12.3%

-4-

concession the Texas dealer received, Reeder would have realized $52,120 in additional profits.[2]

In February 1997, Reeder successfully bid on the sale of two dump trucks to the city of Fort Smith, Arkansas. Volvo granted Reeder a 19% concession on the sale. Three months earlier, Volvo had granted a Kansas City, Missouri, dealer a 21% concession on a sale of two trucks of like grade and quality to Rapidways, a customer located in Kansas City. Once again, had Volvo offered Reeder the same price concession the Kansas City dealer received, Reeder would have realized additional profits for its sale.

In November 1996, Reeder successfully bid on the sale of twenty trucks to New Hi-Way, another Fort Smith customer. Volvo granted Reeder a 24.2% concession on this sale. In February 1997, Volvo granted a Kahoka, Missouri, dealer a 27.3% concession on the sale of five trucks of like grade and quality to Harold Dickey Transport, a customer located in Kahoka. Reeder would have realized higher profits from its successful sale had Volvo granted it a price concession similar to the one offered the other dealer.

In February 1996, Reeder successfully bid on the sale of three trucks to Sam Ludington, another Fort Smith customer. Volvo granted Reeder a concession of 13.27% on this sale. At trial, Reeder compared this three-truck sale to three single-truck sales of like grade and quality trucks made by three separate dealers (in Kansas City, Missouri; Sikeston, Missouri; and Memphis, Tennessee) in September 1996,

---

[2]Reeder also presented evidence showing Lane Freight wanted to add additional trucks to the sale, but Volvo denied Reeder even the original 9% concession, and offered only a 7% concession on the additional trucks. Volvo's conduct caused Reeder to lose profits on the sale of these additional trucks and damaged Reeder's relationship with Lane Freight to the extent that Reeder lost all future sales to Lane Freight.

April 1996, and February 1996. In all three instances, the price concessions Volvo granted the other dealers exceeded the price concession given to Reeder, 18.04%, 15.42%, and 14.53%, respectively.

C.      Unsuccessful Sales Following Volvo's Refusal to Grant Requested Price Concessions.

In a third category of evidence Reeder presented to prove price discrimination, Reeder recounted numerous situations in which it unsuccessfully requested particular concessions from Volvo to close sales, while during the same time frame Volvo granted higher concessions to other Volvo dealers who were able to close sales. For example, in January 1998 Reeder was working on the sale of 170 trucks to Beach Trucking. Reeder requested a price concession of 26.7%, but Volvo only approved 23.8%. Reeder did not get the Beach Trucking contract. During the same time, Volvo gave another dealer a higher price concession on a smaller number of the same trucks, a 26.1% concession on sixty trucks. The other dealer got its contract. In May 1998, Reeder sought a price concession of 21% on a sale of five trucks. Volvo approved only 2%. Reeder did not get its contract. During the same time, Volvo gave another dealer a 10.6% concession on a sale of three trucks of like grade and quality. The other dealer got its contract.

The jury returned a verdict in favor of Reeder on both claims and awarded damages of $1,358,000 on the RPA claim and $513,750 on the AFPA claim. The trial court trebled the RPA damages pursuant to 15 U.S.C. § 15a and awarded Reeder attorney fees. Volvo brought a motion for JAML following trial. The district court denied the motion, and Volvo filed a timely appeal with this court.[3]

---

[3]Reeder did not cross-appeal the district court's grant of summary judgment in favor of Volvo on the alleged primary-line RPA violation.

"We review the denial of a motion for JAML de novo." Naucke v. City of Park Hills, 284 F.3d 923, 929 (8th Cir. 2002). Although our review is de novo, a party seeking posttrial JAML based on the sufficiency of the evidence "faces an onerous burden [because we must] view the evidence in a light most favorable to the jury's verdict [and reverse only] when there is a complete absence of probative facts to support the conclusion reached." Inacom Corp. v. Sears, Roebuck & Co., 254 F.3d 683, 689 (8th Cir. 2001).

A.    The RPA Claim

The RPA provides, in pertinent part:

It shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

There are three types of violations under the RPA. Primary-line violations occur when a seller's price discrimination adversely impacts competition with its own competitors. Secondary-line violations occur when a seller's price discrimination injures competition among its customers. Tertiary-line violations occur when a discriminating seller's purchasers do not compete directly, but their customers compete within a unified market region. Godfrey v. Pulitzer Publ'g Co., 161 F.3d

1137, 1140 (8th Cir. 1998) (Godfrey I). In the instant case, Reeder avers a secondary-line violation, claiming Volvo's price discrimination injured competition among Volvo's customers, i.e., Reeder and other Volvo dealers.

To prove its claim, Reeder had to show 1) Volvo discriminated in price between Reeder and the favored dealers, 2) this price discrimination substantially affected competition between Reeder and the favored dealers, 3) the truck sales occurred in interstate commerce, and 4) the trucks sold by Reeder and the other dealers were of like grade and quality. Godfrey v. Pulitzer Publ'g, Inc., 276 F.3d 405, 408 (8th Cir. 2002) (Godfrey II). In addition, because the RPA prohibits price discrimination "between different purchasers," 15 U.S.C. § 13(a), Reeder had to show there were actual sales at two different prices to two different Volvo dealers, i.e., a sale to itself and a sale to another Volvo dealer. Fusco v. Xerox Corp., 676 F.2d 332, 335 (8th Cir. 1982). In other words, as a threshold matter Reeder had to show it was a "purchaser" within the meaning of the RPA. Id. at 334.

1.      Two-Purchase Requirement

Volvo contends competitive bidding situations do not implicate the RPA because an unsuccessful bidder is not a purchaser. Volvo emphasizes that much of Reeder's proof involved situations where Reeder did not purchase trucks from Volvo. Reeder did not purchase trucks from Volvo in the head-to-head competition with another dealer for the Hiland Dairy contract, for example, because the other dealer got the contract. Likewise, Reeder did not actually purchase trucks from Volvo in those situations where Reeder compared its unsuccessful bids to other dealers' successful sales based on better price concessions.

We agree an unsuccessful bidder is not a purchaser within the meaning of the RPA. In Fusco, we said a purchaser is one who actually makes a purchase, not "one who [merely] seeks to purchase, a person who goes into the market-place for the

-8-

purpose of purchasing." 676 F.2d at 335 (quoting Shaw's, Inc. v. Wilson-Jones Co., 105 F.2d 331, 333 (3d Cir. 1939)). "Thus, a sale at one price plus either an offer to sell at a higher price or a refusal to sell at any price is generally thought not to violate the [RPA]." Id. (citing M.C. Mfg. Co. v. Texas Foundries, Inc., 517 F.2d 1059, 1065 n.11 (5th Cir. 1975)). When Reeder unsuccessfully bid on contracts because Volvo's price concessions were not favorable enough to obtain the contracts, Reeder did not actually purchase trucks from Volvo. Thus, Reeder was not a purchaser in those instances, but merely went into the market-place for the purpose of purchasing. Volvo may have offered to sell trucks to Reeder at a higher price than it offered to other dealers, but mere offers to sell do not violate the RPA.

This conclusion is consistent with the conclusion of many courts that hold price discrimination in the competitive bidding process does not violate the RPA because only one of the two competitors actually makes a purchase. See, e.g., Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 615 (4th Cir. 1985) (holding carpet dealer, who alleged carpet manufacturer offered a competing dealer more favorable price quotes during the competitive bidding process for commercial carpet contracts, failed to state a claim under the RPA because the dealer "had not shown, or even alleged, two comparable, completed sales"); Shaw's, Inc. v. Wilson-Jones Co., 105 F.2d 331, 334 (3d Cir. 1939) ("[The RPA] does not compel a seller of commodities to offer them to all persons who may wish to bid upon a contract to resell them to a third party."); Maier-Schule GMC, Inc. v. Gen. Motors Corp., 780 F. Supp. 984, 989 (W.D. N.Y. 1991) (holding truck dealer failed to state an RPA claim against Volvo and other truck manufacturers by offering dealer's three competitors more favorable discounts where plaintiff dealer purchased no trucks during the relevant time period); Olympia Co. v. Celotex Corp., 597 F. Supp. 285, 297 (E.D. La. 1984) ("[T]he Act protects purchasers in competition with one another at the time of the purchases; it is irrelevant that the companies may have entered into competitive bidding, or that the successful bidder was ultimately able to obtain prices below those offered to its competitors in the bidding process."); but see American Can Co. v.

Bruce's Juices, Inc., 187 F.2d 919, 924 (5th Cir. 1951) (suggesting an exception to the two-purchase requirement when the plaintiff's failure to purchase is directly attributable to the defendant's discriminatory pricing practice); Indus. Burner Sys., Inc. v. Maxon Corp., 275 F.Supp. 2d 878, 886 (E.D. Mich. 2003) (recognizing the exception and denying summary judgment motion even though RPA plaintiff was nothing more than an unsuccessful bidder).

In this case, however, Volvo concedes Reeder was more than an unsuccessful bidder. Reeder gave four examples where it actually purchased Volvo trucks following successful bids on contracts. Reeder compared those successful sales to actual sales made by other dealers during the same time period (Reeder purchased fifty-five trucks and compared those purchases to other dealers' purchases of twenty-two trucks). Although Volvo challenges the sufficiency of these actual purchase-to-purchase comparisons on other grounds (addressed below), these successful bids clearly gave Reeder "purchaser" status. As a result, it follows Reeder was entitled to pursue a claim for price discrimination under the RPA. See, e.g., DeLong Equip. Co. v. Washington Mills Electro Minerals Corp., 990 F.2d 1186, 1202 (11th Cir. 1993) (recognizing that even "minimal sales" (i.e., minimal purchases from manufacturer) made by an otherwise unsuccessful bidder are enough for bidder to state an RPA claim).

2.    Actual Competition

Volvo argues Reeder failed to show it was in actual competition with the favored dealers. The standard for showing actual competition is whether, "as of the time the price differential was imposed, the favored and disfavored purchasers competed at the same functional level, i.e., all wholesalers or all retailers, and within the same geographic market." Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578, 585 (2d Cir. 1987). Here there is no dispute the dealers all competed

-10-

at the same functional level, but Volvo contends Reeder did not compete within the same geographic market as the favored dealers. We disagree.

Although Reeder had an assigned geographic area (ten counties in western Arkansas and two counties in eastern Oklahoma), it was free to sell outside that area, and did so. Reeder introduced evidence that it looked to the entire continental United States in making its sales, and had sold or delivered trucks in Arkansas, Oklahoma, Missouri, Texas, Iowa, Illinois, Minnesota, Ohio, Pennsylvania, North Carolina, Georgia, Colorado, and Oregon. Reeder also established that end-buyers of the trucks are very mobile and price-shop nationwide.

Reeder's evidence focused upon sales and bids made in the southwest region of the United States. Reeder presented evidence of sales or bids it made in three states in the southwest region (Arkansas, Missouri, and Oklahoma) and compared the sales or bids to those made by other dealers in four states in the southwest region (Arkansas, Missouri, Texas, and Tennessee). Reeder presented at least two instances where it competed directly with a favored dealer – the head-to-head competition with Southwest Missouri Truck Center in Springfield, Missouri, for a twelve-truck deal to Hiland Dairy, and a concession request from Reeder for a five-truck deal to Tommy Davidson which also involved a bid made by a Volvo dealer in Springdale, Arkansas. Finally, Reeder presented evidence about Volvo's designated Southwest Region to show there were no natural or physical barriers that would restrict the flow of heavy trucks in commerce or affect the freedom of customers to travel throughout the region to purchase heavy trucks. From this evidence a jury could reasonably decide Reeder was in actual competition with favored dealers. See Godfrey II, 276 F.3d at 411 ("[A]lthough . . . dealers operate in exclusive geographic territories, that fact is not dispositive on the question of competition. Even where parties operate in airtight territories, they compete if the end-buyers of the product can freely travel between the geographic areas to purchase the commodity in question.").

3.    Like Grade and Quality; Reasonably Contemporaneous in Time

To establish an RPA violation, Reeder had to show the comparative sales involved trucks of like grade and quality. Id. at 408. Products are not of like grade and quality "if there are substantial physical differences in products affecting consumer use, preference or marketability." Checker Motors Corp. v. Chrysler Corp., 283 F. Supp. 876, 889 (S.D. N.Y. 1968), aff'd, 405 F.2d 319 (2d Cir. 1969). Volvo argues the sales-to-sales comparisons made by Reeder involved trucks with different major components that affected consumer preference and marketability. In support of its position Volvo points to trial testimony which showed differences in truck components influence consumers' decisions to buy – particularly engine types and gear ratios.

Reeder offered testimony, however, showing that any differences in components were inconsequential – in all cases the trucks were the same model and same year, with comparable engines and largely similar components. Also, Reeder provided evidence that the differences in components were taken into account in the calculation of the price quotes and concessions, so the jury could reasonably conclude that when the comparisons involved trucks with somewhat different components, the differences did not substantially affect the concessions Volvo offered.

We note the RPA says the commodities involved must be of *like* grade and quality, not *identical* grade and quality. We have previously indicated the concept "was designed to serve as one of the necessary *rough guides* for separating out those commercial transactions insufficiently comparable for price regulation by the statute." Moog Indus. v. Fed.Trade Comm'n, 238 F.2d 43, 50 (8th Cir. 1956) (quoting the Report of the Attorney General's Nat'l Comm. to Study the Anti-Trust Laws 157 (1955)) (emphasis added). We believe our comments have been correctly interpreted to reflect a "sensible approach," and a "somewhat flexible application" of the like

grade and quality concept.  White Indus., Inc. v. Cessna Aircraft Co., 657 F. Supp. 687, 698 (W.D. Mo. 1987) (applying Moog).

Here, the jury was instructed on the concept of like grade and quality, and Volvo does not argue the district court erred in its instructions.  The jury found by special interrogatory the comparisons involved trucks of like grade and quality.  We acknowledge there was conflicting evidence on the substantiality of the differences in components, but there was ample evidence supporting the jury's determination the differences were immaterial.  "There was conflicting evidence on this issue, and it could have gone either way.  Making decisions of this kind is exactly what juries are for."  GLB Enters., Inc. v. United States, 232 F.3d 965, 969 (8th Cir. 2000) (quotation omitted).

Reeder also had to show the comparative sales were reasonably contemporaneous in time, but "there is no requirement that the two sales be made at precisely the same time or place."  DeLong Equip., 990 F.2d at 1202 (11th Cir. 1993).  The four sales-to-sales comparisons offered by Reeder were between one and four months apart, with one exception; Reeder compared its three-truck sale to Sam Ludington in February 1996 to three separate one-truck sales by other dealers, and one of those sales took place in September 1996 (another took place in February 1996 and the third in April 1996).  Volvo argues the sales were not contemporaneous because as little as a single-month gap could make a substantial difference in the price concession it offered due to changes in model-year availability or backlog or both.  Volvo  refers us to a part of the trial transcript that says exactly that, as little as a month "*could* make a difference."  Volvo's Brief at 35 (referring to App. 1623) (emphasis added).  Volvo never presented evidence, however, to show the gaps between the sales comparisons involved in this case *did* make a difference in the price concessions it offered.  Again, the jury was instructed on the issue whether the comparative sales occurred at about the same time, found by special interrogatory that they did, and Volvo does not challenge the district court's instructions.  Under the

-13-

standard we must apply in reviewing a motion for JAML, we find no basis for disturbing the jury's verdict.

4. Injury/Damages

a. Competitive Injury

The RPA prohibits price discrimination "where the effect of such discrimination may be substantially to lessen competition . . . or to injure, destroy, or prevent competition." 5 U.S.C. § 13(a). The RPA "guards against injury to competition, not injury to individual competitors." Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381, 387 n.3 (8th Cir. 1987). The RPA does not, however, "require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they 'may' have such an effect." Corn Prods. Ref. Co. v. Fed. Trade Comm'n, 324 U.S. 726, 742 (1945).

A plaintiff may demonstrate a reasonable possibility of competitive injury in two ways. "First, plaintiff may introduce direct evidence that disfavored competitors lost sales or profits as a result of the discrimination." Rose Confections, 816 F.2d at 385 (citing Falls City Indus., Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 437-38 (1983)). In other words, while the RPA does not guard against injury to individual competitors, proving injury to individual competitors is one way to demonstrate a discriminatory practice likely injured competition. "Second, [a plaintiff] can show that the favored competitor received a substantial price reduction over a substantial period of time, which gives rise to a permissible inference of competitive injury." Id. (citing Fed. Trade Comm'n v. Morton Salt Co., 334 U.S. 37, 50-51(1948)). Volvo argues Reeder failed to demonstrate a reasonable possibility of competitive injury because Reeder did not prove the lower concessions Volvo granted to other dealers drew sales away from Reeder. We disagree.

-14-

The evidence presented by Reeder was sufficient for the jury to conclude Volvo's discriminatory concessions resulted in lost profits and sales to Reeder and other dealers, and that favored competitors received substantial price reductions over a substantial period of time. As stated above, Volvo acknowledged in December 1997 that it wanted to cut the number of its dealers in half as part of its "Volvo Vision." At trial, Volvo acknowledged it had, in fact, succeeded in reducing the numbers of its dealers. While admitting 1998 was a good market for the sale of heavy trucks overall and 1999 was Volvo's "record year," App. 1340, Volvo nevertheless sent approximately twenty termination letters to Volvo dealers in 1999 and early 2000, and placed another twenty or so dealers on probation during the same time period. From this evidence, the jury could properly infer Volvo's intent to reduce the number of its dealers manifested itself in the discriminatory concession practices.

Reeder also presented evidence that it lost profits and sales as a result of Volvo's price concession practices. For example, in the head-to-head competition with Southwest Missouri Truck Center for the Hiland Dairy contract, Reeder lost gross profits of $30,000. On the Lane Freight sale, one of the four sales-to-sales comparisons Reeder presented to prove its purchaser status, Reeder lost gross profits of $52,120. Reeder also presented evidence from which the jury could conclude Volvo's discriminatory practice cost Reeder all future sales to Lane Freight. Reeder's evidence showed it lost gross profits on the other sales-to-sales comparisons as well.

Reeder showed its sales of Volvo trucks had been solid prior to the period of Volvo's price discrimination (1996-2000). During the period of discrimination, Reeder's sales decreased substantially and its profit margins were lower despite increased sales efforts. In all, Reeder's gross profits fell from $165,499 in 1996 to $26,327 in 2000. At the same time, favored dealers' sales and overall market sales stayed strong. Based on this evidence, the jury could reasonably conclude Reeder's average gross profit was lower than the average of favored Volvo dealers because Volvo discriminated against Reeder in its price concessions.

-15-

Reeder also presented evidence that Volvo's practice extended over a substantial period of time (1996-2000). In addition, the evidence established that dealer profit margins were narrow during that time. Thus, the jury could reasonably conclude even small differences in price concessions had a substantial impact on competition.

### b. Actual Injury

Although Reeder only needed to prove competitive injury *may* result to establish a violation of 15 U.S.C. § 13(a), it had to make some showing of actual injury to itself to recover treble damages under 15 U.S.C. § 15(a). See, e.g., J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1539-40 (3d Cir. 1990) (discussing the difference between demonstrating competitive injury under § 13(a) and proving actual injury under § 15(a)). Volvo argues Reeder did not show actual injury because Reeder offered too few examples of Volvo's discriminatory practices, there was no evidence the favored dealers sold the trucks to end-users at lower retail prices, and no evidence the end users selected the favored dealers' bids because of the lower prices. We believe Volvo construes too narrowly the requirements for proving actual injury.

In addressing whether Reeder proved it was actually injured by Volvo's price discrimination, Volvo would have us limit our analysis to the one instance of direct head-to-head competition with Southwest Missouri Truck Center for the Hiland Dairy contract and the four sales-to-sales comparisons Reeder offered to prove its purchaser status, while disregarding all the other evidence offered to prove actual injury. We believe such an approach is inconsistent with the Supreme Court's teachings, both with respect to the role circumstantial evidence plays in RPA claims and the scope of injury to be remedied by the RPA.

-16-

Reeder presented other substantial evidence to prove competitive and actual injury. Reeder presented numerous instances of its unsuccessful sales due to Volvo's failure to grant requested price concessions, and evidence of Volvo's admitted intentions to reduce the number of its dealers. Indeed, Reeder showed Volvo successfully reduced the number of its dealers and placed many more on probation during a "record" sales period. Reeder presented evidence that its own sales and profits were substantially reduced during this boom in the heavy truck industry, despite an increase in its own sales efforts. From this evidence the jury could reasonably infer Volvo's discriminatory practice and Reeder's injuries extended beyond the five specific head-to-head and sales-to-sales comparisons.

In Perkins v. Standard Oil Co., 395 U.S. 642 (1969), the Supreme Court discussed the role of circumstantial evidence in proving the causal connection between a defendant's discriminatory pricing practices and the plaintiff's damages. Perkins, a gasoline retailer, alleged price discrimination between itself and a competitor, Regal, another gasoline retailer far down the distribution ladder from Standard. There was no direct evidence Regal sold the gasoline to its customers at lower retail prices than did Perkins because of the price discrimination, and no direct evidence Regal's customers selected their gasoline over Perkins's because of lower prices. Nevertheless, the Supreme Court upheld the jury's verdict against Standard and in favor of Perkins based on circumstantial evidence.

> If there is sufficient evidence in the record to support an inference of causation, the ultimate conclusion as to what that evidence proves is for the jury. Here the trial judge properly charged the jury that Perkins had the burden of showing that any damage to his business was proximately caused by Standard's price discriminations and there was substantial evidence from which the jury could infer causation. There was evidence that Signal received a lower price from Standard than did Perkins, that this price advantage was passed on, at least in part, to Regal, and that Regal was thereby able to undercut Perkins' price on gasoline. Furthermore, there was evidence that Perkins repeatedly complained to

-17-

> Standard officials that the discriminatory price advantage given Signal was being passed down to Regal and evidence that Standard officials were aware that Perkins' business was in danger of being destroyed by Standard's discriminatory practices. This evidence is sufficient to sustain the jury's award of damages under the Robinson-Patman Act.

Perkins, 395 U.S. at 648-49 (internal citation omitted).

Likewise, here there was sufficient evidence from which the jury could infer favored dealers received lower prices from Volvo than did Reeder, and this price advantage allowed other dealers to undercut Reeder's prices, hurting Reeder's sales and profits. There was also evidence Volvo was aware this discriminatory practice could destroy Reeder's business; indeed, the elimination of some dealers like Reeder appeared to be Volvo's intent. This is precisely the type of injury the antitrust laws were meant to prevent. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 125 (1969) (permitting causality to be inferred from circumstantial evidence where the injury involved was "precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause."). Moreover, Reeder was not required to prove Volvo's price discrimination was the only reason for its injuries, or the only reason for heavy truck customers' purchasing decisions – it was enough that Reeder showed the price discrimination was a "material" cause of its injuries. Id. at 114 n.9 ("It is enough that the illegality is shown to be a material cause . . . a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4.")

Volvo would also have us limit the scope of Reeder's injury to the four sales-to-sales comparisons which Reeder presented to prove its purchaser status. The Supreme Court has, however, eschewed an approach whereby damages are mechanically calculated simply by comparing the price differentials of a defendant's actual transactions between favored and disfavored competitors. "Damages resulting from illegal price discrimination may not be measured merely by determining the

-18-

overcharge to the disfavored buyer, i.e., the excess paid by disfavored buyer for the goods it purchased." Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1043 (9th Cir. 1988) (citing J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 557 (1981)). Instead, Reeder had both the burden and opportunity of proving damages "on the basis of plaintiff's estimate of sales it could have made absent the violation." J. Truett Payne, 451 U.S. at 565 (citing Zenith Radio, 395 U.S. at 123-24). Thus, Reeder was entitled to present evidence beyond the price differential of the four specific sales-to-sales comparisons it offered to prove its purchaser status, and the jury was free to award damages beyond those transactions.

         c.      Calculation of Damages

Finally, Volvo challenges the proof Reeder presented to calculate the amount of its damages. We reject this challenge. Having established an actual injury caused by Volvo's antitrust violations, Reeder will not be held to stringent burdens in proving the actual amount of those injuries. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-66 (1946). The jury may not render its verdict based on speculation or guesswork, but it may make a just and reasonable estimate or approximation. Id.

> [D]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.

Zenith Radio, 395 U.S. at 123-24 (citations, internal quotations omitted).

Underpinning most of Volvo's complaints about the calculation of damages is its claim the district court erred in permitting one of Reeder's co-owners, Bill Heck, to testify about Reeder's lost profits and the value of the company. We note the district court has broad discretion in determining whether to admit lay or expert testimony, Anderson v. Raymond Corp., 340 F.3d 520, 523 (8th Cir. 2003); United States v. Oliver, 908 F.2d 260, 263-64 (8th Cir. 1990), and we find no abuse of discretion under these circumstances where Reeder laid the proper foundation to show Heck's knowledge, as a business owner, of the business's value and its lost profits. See Mississippi Chem. Corp. v. Dresser-Rand Co., 287 F.3d 359, 373 (5th Cir. 2002) (collecting cases allowing lost profit testimony where the witness has direct knowledge of the business accounts underlying the profit calculation).

Volvo attacks as pure speculation Heck's use of a multiplier in calculating the value of the Volvo franchise to Reeder. Heck testified multipliers were often used to calculate the value of truck franchises and he selected one based on his knowledge of current practices. Volvo's own experts confirmed multipliers are thus used. The only difference in opinion between Volvo's experts and Heck was which multiplier to use. Volvo's experts would have used a multiplier of two, three or four, while Heck used five. We find Volvo's challenge to Heck's use of a multiplier to be without merit. Volvo does not argue why five in particular was speculative, only that Heck had no basis for choosing it. Indeed, Volvo's experts did not testify five was improper, only that they would have used a lower multiplier. We conclude it was for the jury to determine the relative credibility of the witnesses, and resolve this conflict in the evidence. Furthermore, the district court instructed the jury it could not award damages based on the value of the lost franchise, and could use that figure only for guidance in determining Reeder's lost profits. Volvo did not object to that instruction, and does not aver error in the instruction.

Reeder further calculated its damages by subtracting its actual sales in the years of Volvo's violations (1996-2000) from the sales objectives set by Volvo for those

same years. The result represented the number of trucks Reeder argued it would have sold absent Volvo's wrongdoing. That number was then multiplied by Reeder's average gross profits per truck. Reeder also provided alternative evidence of the average gross profits of all Volvo dealers, which when multiplied by the estimated number of lost truck sales, yielded amounts similar to the results obtained when subtracting actual sales from Volvo's sales objectives. From these estimates Reeder subtracted certain expenses, including commissions to salespersons and advertising. Thus, the jury had several reasonable figures from which to choose in calculating damages.

Volvo argues Volvo's sales objectives bore no reasonable relationship to Reeder's lost profits, so it was improper to compare the sales objectives to Reeder's actual sales. But Volvo's own witnesses testified its sales objectives were reasonable. The objectives were calculated using market data and were intended by Volvo to represent a reasonable "minimum performance" expectation of each individual franchise. It was further established at trial Reeder met, and sometimes exceeded, Volvo's objectives before the onset of the alleged price discrimination period.

In sum, we believe Volvo's argument essentially reduces to a demand there be a stronger causal link proved between every dollar of damages awarded and Volvo's antitrust violations. We conclude that argument is inconsistent with the relaxed standard applied to a plaintiff's ascertainment of damages, after having established actual injury. E.g., Bigelow, 327 U.S. at 264-66. The relationship between likely sales and actual sales is precisely the relationship that should guide an estimate of damages in a price discrimination action. It is imprecise to be sure, but that imprecision cuts against Volvo. See J. Truett Payne, 451 U.S. at 566 ("[I]t does not 'come with very good grace' for the wrongdoer to insist on specific and certain proof of the injury which it has itself inflicted.") (quoting Bigelow, 327 U.S. at 264-65).

-21-

B.    The AFPA Claim

Volvo contends the district court lacked subject matter jurisdiction over Reeder's AFPA claim.  Volvo advances several arguments to support this premise.  First, because Reeder's allegations concern the franchise relationship between a motor vehicle dealer and manufacturer, Volvo claims the allegations are governed by the Arkansas Motor Vehicle Commission Act (AMVCA), Ark. Code Ann. §§ 23-112-101 through 23-112-706, rather than the AFPA.  Volvo contends the AMVCA is more specific than the AFPA as applied to the franchise relationship involved here, and therefore controls.  Next, Volvo argues Reeder must exhaust its administrative remedies before the Arkansas Motor Vehicle Commission (Commission) before filing a civil action for a violation of the AMVCA.  Finally, Volvo contends the AMVCA requires Reeder to prove a "willful" violation of its provisions before recovering damages in a civil action, see Ark. Code Ann. § 23-112-05, and Reeder's sole source of statutory remedies are comprised in the AMVCA's remedy provisions.  We disagree with Volvo's ultimate contention — that the district court lacked jurisdiction — because we disagree with each of Volvo's arguments.

Volvo's first argument is the AMVCA is more specific than the AFPA as applied to the franchise relationship between a motor vehicle dealer and manufacturer, and because the two statutory schemes conflict, the AMVCA should govern.  See, e.g., Valley Nat'l Bank of Ariz. v. Stroud, 711 S.W.2d 785, 786 (Ark. 1986) ("In statutory construction where specific expressions conflict with general expressions, the rule is to give greater effect to the specific expression.").

We have doubts about which of the two statutory schemes is more specific as applied to the franchise relationship between a motor vehicle dealer and a manufacturer.  The AMVCA is a regulatory statute governing the relationships not only between dealers and manufacturers, but also salespersons, lessors/lessees, distributors and their representatives, factories and their representatives, and others

in the motor vehicle industry. The AMVCA empowers the Commission to set professional standards and grant and revoke licenses. Thus, while the AFPA is broader in the sense it covers all franchise relationships, not just those involving motor vehicle dealers and manufacturers, the AMVCA is broader in that it covers all relationships in vehicle sales, not just franchise relationships. The relationship between Volvo and Reeder falls in the confluence of the two statutes.

We need not resolve which of the statutes is more specific than the other as applied to this fact pattern, however, because we conclude Volvo's first argument fails based on the application of other principles. Clearly, both statutory schemes relate to the subject matter of franchise relationships between motor vehicle dealers and manufacturers, and thus we must read them "in a harmonious manner if possible." City of Fort Smith v. Tate, 844 S.W.2d 356, 359 (Ark. 1993) ("All statutes on the same subject are *in pari materia* and must be construed together and made to stand if capable of being reconciled."). Arkansas law further directs us to "view[] them [i.e., the two statutory schemes,] as a single system, and giv[e] effect to the general purpose of the system." Arkansas County v. Desha County, 27 S.W.3d 379, 383 (Ark. 2000).

The AMVCA specifically allows for the courts, not the Commission, to award damages and attorney fees to a licensee harmed by willful violations of the statutory scheme. See Ark. Code Ann. § 23-112-105. Likewise, the AFPA provides a civil remedy for franchisees harmed by franchisors acting in a commercially unreasonable manner. See Ark. Code. Ann. §§ 4-72-206 (making it unlawful for franchisors to "refuse to deal with a franchise in a commercially reasonable manner") & 4-72-208 (providing a private right of action to franchisees harmed by a violation of the AFPA). Thus, we have little trouble concluding both statutory schemes give persons or entities harmed by a violation of the statutes the right to sue in court, and at least one purpose of the overall system seems to be to protect persons or entities like Reeder from persons or entities like Volvo. We therefore find no conflict between

the remedies provisions of the two statutes, and see no reason why a franchisee/licensee like Reeder could not choose to pursue remedies under either statutory scheme.

Furthermore, assuming arguendo a conflict between the two remedial statutes, we believe AFPA's would control because it was enacted two years after the AMVCA. See Kyle v. State, 849 S.W.2d 935, 937 (Ark. 1993) ("The settled rule of statutory construction is that if two legislative acts relating to the same subject are in conflict with each other, the later act controls."). The AFPA refers to three specific franchise situations where the Arkansas legislature directed it would not apply. See Ark. Code Ann. § 4-72-203 (indicating the AFPA does not apply to "franchises subject to the provisions of § 4-702-401 et seq. and § 4-72-501 et seq., or which are subject to the Federal Trade Commission [Franchise Rule], 16 C.F.R. 436.1 et seq."). Notably absent is a reference to franchises subject to the provisions of the AMVCA. Because the Arkansas legislature expressly noted those situations where the AFPA would not apply, we conclude it would have expressly referred to the AMVCA if it intended franchises covered by both Acts to be limited to the remedies available under the AMVCA. See Chem-Ash, Inc. v. Ark. Power and Light Co., 751 S.W.2d 353, 354 (Ark. 1988) ("It is fundamental statutory construction law that the express designation of one thing may properly be construed to mean the exclusion of another.").

Volvo's next argument is that Reeder must exhaust the administrative remedies established by the AMVCA before filing this civil action against Volvo. Again, we disagree. The Commission's power is limited to granting injunctions,[4] revoking

---

[4]Ark. Code Ann. § 23-112-104.

licenses,[5] or imposing fines payable to the state treasury,[6] so the Commission could not award damages to Reeder. Exhaustion of administrative remedies is not required if those remedies are inadequate. See, e.g., Cummings v. Big Mac Mobile Homes, Inc., 980 S.W.2d 550, 552 (Ark. 1998) (holding plaintiffs not required to exhaust remedies with the Arkansas Manufactured Home Commission when the Commission only provided damages for the cost of repairs and the plaintiffs asserted their mobile home was beyond repair); Delta Sch. of Commerce, Inc. v. Harris, 839 S.W.2d 203, 207 (Ark. 1992) ("Inadequate administrative remedies need not be exhausted.").

Finally, since the AMVCA requires Reeder to prove a willful violation of its provisions before recovering damages in a civil action, Volvo posits Reeder should not be entitled to recover damages under the AFPA's less-stringent standard. As stated above, however, we see no conflict between the two statutory schemes. And as we noted, the Arkansas legislature specifically mentioned those situations where the AFPA would not apply and did not refer to franchise situations governed by the AMVCA. From this we discern no legislative intent to limit the remedies of motor vehicle franchisees to the more stringent standard required by the AMVCA.

In sum, the AMVCA did not impose an impediment to Reeder's suit for damages under the AFPA, and the district court had jurisdiction over this matter.

III

We affirm the judgment entered in the district court in all respects.

---

[5]Ark. Code Ann. § 23-112-308.

[6]Ark. Code Ann. §§ 23-112-205 & 23-112-309.

HANSEN, Circuit Judge, concurring in part and dissenting in part.

Although I do not disagree with the court's resolution of the state law issue, I write separately to express my view that Reeder has failed to make out a claim under the Robinson-Patman Act. Even viewing all of the evidence in the light most favorable to the verdict, I conclude that Reeder cannot prove the necessary elements to recover treble damages in this case. Specifically, Reeder has not proven a violation of § 13(a) because the facts fail to show injury or likelihood of injury to actual competition between Reeder and the "favored" Volvo dealers. Furthermore, even if we assume that Volvo violated § 13(a), there is absolutely no indication that any such violation was the cause of Reeder's injury, for the purpose of recovering damages under § 15(a). I therefore respectfully dissent from Section II(A) of the court's opinion.

There is little doubt that the facts of this case fail to fit neatly into the framework that courts have established in analyzing Robinson-Patman Act secondary-line claims. Much of my disagreement in this case stems from what I perceive as the court's attempt to fit a square peg into a round hole. Traditional RPA cases involve sellers and purchasers that carry inventory or deal in fungible goods. By contrast, the parties in this case operate in a unique marketplace where special-order products are sold to individual, pre-identified customers only after competitive bidding. By its very nature, this process will never produce the kind of competition the RPA was designed to protect because it will never result in the type of two-purchase transaction that itself creates a market for the goods that are sold. Indeed, where, at the time of the end purchase, only one possible seller and one possible buyer exist, competition is totally absent. It is the nature of competitive bidding, not price discrimination, that makes it so.

The court properly recognizes that a competitive bidding situation will never involve two "purchasers," and thus always will fall outside of the purview of the

RPA. Despite this determination, however, the court goes on to conclude that Reeder's purchases with respect to four transactions give it "purchaser status" as to separate instances in which it did not make a purchase, and therefore was not in fact a purchaser. I disagree with this proposition. Reeder cannot piggyback nonpurchaser transactions onto purchaser transactions for purposes of recovering under the RPA. My concern does not stem from a strict adherence to the two-purchase requirement, but rather from my belief that "purchaser status" is inextricably intertwined with the existence of actual competition and the possible threat thereto. Because my primary objection to the court's opinion is that it overlooked this important aspect of <u>actual competition</u>, I turn next to that issue.

Despite the fact that Reeder operates at the same functional level as the "favored" Volvo dealers and that they may do business in the same or overlapping geographic areas, I nevertheless conclude that Reeder has failed to prove that it was in actual competition with the "favored" Volvo dealers. There certainly may exist a national market in which heavy-truck dealers compete to receive the opportunity to bid on potential sales to customers. The Volvo dealers in this case very well may have competed against each other in this market on a regular basis. However, any difference in price that Volvo eventually may quote to a dealer who actually bids on a potential sale has no effect on this market. The evidence shows that an end user's decision to request a bid from a particular dealer or to allow a particular dealer to bid is controlled by such factors as an existing relationship, geography, reputation, and cold calling or other marketing strategies initiated by individual dealers. Once bidding begins, however, the relevant market becomes limited to the needs and demands of a particular end user, with only a handful of dealers competing for the ultimate sale. <u>Cf.</u> <u>FTC v. Fred Meyer, Inc.</u>, 390 U.S. 341, 349 (1968) (Section 2(d) "reaches only discrimination between customers competing for resales at the same functional level...."). Thus, although Reeder and other "favored" dealers may have competed generally with each other in the larger market for obtaining bids, there is evidence of only two occasions where Reeder competed with a "favored" Volvo

dealer for an actual sale. Reeder's attempt to compare a sale that it made to one end user to a sale made by a "favored" Volvo dealer to another end user with whom Reeder had no relationship simply is not relevant to proving a violation of the RPA because there was no actual competition between the two dealers at the time of the sales to the separate and different end users.

Without proof of actual competition, Reeder cannot demonstrate a reasonable possibility of competitive injury. Indeed, where alleged lost sales or profits were not diverted from Reeder to "favored" Volvo dealers, but rather to other non-Volvo dealers, it is unclear how any difference in price offered by Volvo to its two dealers could possibly injure actual competition between them. See Falls City Indus., 460 U.S. at 437-38 (finding competitive injury based on direct evidence of sales diverted away from plaintiff to a favored customer). Even if Volvo's calculation of concessions caused Reeder to lose profits or sales, there is no violation of the RPA if there is no injury to competition between Reeder and the "favored" Volvo dealers. Furthermore, Volvo can successfully rebut any Morton Salt inference of injury to competition between Reeder and the "favored" Volvo dealers because the evidence clearly establishes that none of the lost sales or profits was diverted from Reeder to those "favored" dealers. Although Volvo's conduct may have injured Reeder's ability to compete with non-Volvo dealers, Reeder must look outside the RPA for any relief for this claimed injury. Contrary to the court's assertion, such an injury is not the type of injury to competition that the RPA was intended to prevent.

It is my view that an injury to competition can be proven only where the factors necessary to state an RPA claim all are present in the same relevant transaction. To the extent that the court looks for the existence of one factor in one transaction and the existence of another factor in a second transaction, I conclude that the proof in this case is too tenuous and requires too many inferences piled atop inferences to reach the court's result.

-28-

Nevertheless, even if we assume that Volvo violated § 13(a) of the RPA, I would reverse Reeder's RPA damage award because Reeder has failed to prove that it was actually injured by Volvo's price discrimination as required by § 15(a). See J. Truett Payne, 451 U.S. at 562 ("To recover treble damages, then, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent."). Although Reeder may have established that it lost sales and profits to other non-Volvo competitors, there can be no inference of actual injury for the purpose of the RPA without some evidence (and there is none in this record) that the discriminatory pricing caused those sales and profits to be diverted from Reeder to another Volvo dealer who received more favorable terms from Volvo.

Reeder relies on four different scenarios to demonstrate actual injury and to calculate its damages. First, Reeder points to instances in which it bid unsuccessfully against non-Volvo competitors because Volvo failed to quote Reeder the same concession that it gave to a "favored" Volvo dealer in a separate sale to a different end user. Second, Reeder cites instances in which it bid successfully against non-Volvo competitors but did not make as much in profit on the successful deal because it did not receive the same concession that a "favored" Volvo dealer received in an entirely separate sale to an entirely different end user. Third, Reeder relies on the transaction involving Tommy Davidson in which Reeder and another Volvo dealer, who allegedly received a better concession quote from Volvo, both lost the ultimate sale to a non-Volvo competitor. Finally, Reeder cites to the deal involving Hiland Dairy in which Reeder and another "favored" Volvo dealer both received equal concession quotes from Volvo and submitted equal bids to the same end user. Months later after Volvo's prices had increased, Hiland Dairy placed its order with the "favored" Volvo dealer for reasons unrelated to price, but insisted on receiving the original lower price. The other dealer then requested an additional concession in order to offer Hiland Dairy its original quoted price. Notably, Hiland Dairy purchased all of its trucks both before and after this transaction from the same "favored" Volvo dealer. More notably, there is nothing in the evidence to show that

-29-

had Hiland Dairy made the same request of Reeder that Volvo would not have "favored" Reeder with the same concession in order to get the business.

Although it is possible that Reeder lost sales or profits to non-Volvo dealers because it did not receive a sufficiently high concession from Volvo in the first three scenarios, the <u>difference</u> in concessions offered to Reeder and the "favored" Volvo dealers did not cause the lost sales or profits on those deals. In order to prove that the § 13(a) violation caused its injuries, Reeder essentially must show that absent a price difference, it would not have lost those sales or profits. However, even if Volvo had not offered the "favored" dealers greater concessions, i.e., not discriminated, there still is no proof that Reeder would have made the sales. Furthermore, as to the sales that Reeder did make, it would be improper to calculate lost profits based on what Reeder otherwise characterizes as illegal price discrimination.

The fact that the sales and profits were not diverted from Reeder to "favored" Volvo dealers demonstrates not only a lack of causation of actual injury under § 15(a), but also seriously undermines our court's conclusion that there is any likelihood of injury to competition between Reeder and the "favored" Volvo dealers. Reeder alleges that Volvo intended to put Reeder out of business. While intent may be relevant to prove a primary-line violation, <u>see</u> <u>Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet</u>, 824 F.2d 582, 595-96 (8th Cir. 1987), <u>cert. denied</u>, 484 U.S. 1010 (1988), it offers nothing in this case. At most, the facts show that Volvo acted unreasonably in failing to give Reeder sufficient concessions to allow it to compete with other non-Volvo dealers. While such conduct may very well give rise to some sort of liability under state law, I conclude that it does not support a judgment for treble damages under the Robinson-Patman Act. I respectfully dissent.

_____