**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 28, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

B-S STEEL OF KANSAS, INC., a
Kansas corporation,

      Plaintiff - Appellant,

    v.

TEXAS INDUSTRIES, INC., a
Delaware corporation, also known as
TXI; CHAPARRAL STEEL
COMPANY, a Delaware corporation,
also known as TXI Chaparral; and
CHAPARRAL STEEL TEXAS, INC.,
a Delaware corporation,

      Defendants - Appellees.

No. 04-3327

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 01-CV-2410-JAR)**

---

David A. Rameden, Shook, Hardy & Bacon, LLP, Overland Park, Kansas
(Jerrod A. Westfahl, Shook, Hardy & Bacon, LLP, Overland Park, Kansas, and
James R. Eiszner, Shook, Hardy & Bacon, LLP, Kansas City, Missouri, with him
on the briefs), for Plaintiff - Appellant.

George E. Leonard (Dennis D. Palmer with him on the brief), Shughart, Thomson
& Kilroy, P.C., Kansas City, Missouri, for Defendants - Appellees.

---

Before **LUCERO**, **ANDERSON**, and **MURPHY**, Circuit Judges.

**ANDERSON**, Circuit Judge.

Appellant B-S Steel of Kansas, Inc., a Kansas corporation, brought suit against four steel manufacturers, Chaparral Steel Company ("CSC"), Chaparral Steel Texas, Inc., Texas Industries, Inc., and Chaparral Steel Midlothian, L.P. ("Midlothian") (collectively referred to as the "original defendants"), all related entities. Its complaint alleged price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13, and a number of state law claims. The district court referred the claims against one of the defendants, Midlothian, involving pre-April 3, 2001 transactions, to arbitration, and the arbitration panel concluded that B-S Steel could not show antitrust injury or prove an amount of damages on these claims. The district court confirmed the arbitration award and dismissed Midlothian as a party. The remaining three defendants moved for summary judgment, and the district court granted their motion, concluding that the arbitration award was entitled to preclusive effect and thus barred B-S Steel's claims for damages, and that B-S Steel lacked standing to pursue injunctive relief. B-S Steel appealed. We affirm for the reasons stated below.

**BACKGROUND**

B-S Steel is an independent distributor of wide flange steel beams ("WFB"), which it purchases from manufacturers and then sells to subcontractors for use in construction. In 1988, B-S Steel executed a Conditions of Sale agreement with and began purchasing WFB from CSC. In 1997, B-S Steel signed another Conditions of Sale document, issued by Midlothian, and continued purchasing WFB. A third Conditions of Sale document was executed on April 3, 2001.

In October 1999, while B-S Steel was purchasing WFB from the defendants, the defendants initiated a pilot incentive program with one of its largest customers, granting a $5 or $10 rebate per ton of WFB purchased. Similar incentives—including rebates, quick-pay discounts, and fixing prices in relation to those of foreign WFB suppliers—were extended to four other purchasers, not including B-S Steel, during the period 1999 through the end of 2001. These incentives were granted in secret, on condition that the favored purchasers use the savings for capital improvements rather than passing it on to their customers. However, B-S Steel discovered the incentives program in May 2001 and soon afterwards initiated the present lawsuit against the defendants in Kansas district court.

In its amended complaint, B-S Steel alleged that the defendants had engaged in price discrimination, in violation of the Robinson-Patman Act, 15

U.S.C. § 13(a);[1] as well as fraud, misrepresentation, and intentional interference with prospective business advantage, in violation of state law. B-S Steel sought damages, including treble damages under § 4 of the Clayton Act, id. § 15,[2] as well as injunctive relief, under § 16 of the Clayton Act, id. § 26,[3] for its alleged injury.

---

[1]The Robinson-Patman Act provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them[.]

15 U.S.C. § 13(a). The provision contains a number of caveats, including "[t]hat nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade." Id. Subsection (b) also allows a defendant in a subsection (a) action to rebut the plaintiff's prima facie case "by showing that his lower price . . . was made in good faith to meet an equally low price of a competitor." Id. § 13(b).

[2]A plaintiff who prevails in a suit alleging "injur[y] in his business or property by reason of anything forbidden in the antitrust laws," which includes the Robinson-Patman Act, is entitled to "recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

[3]     Any person, firm, corporation, or association shall be

(continued...)

-4-

Defendant Midlothian moved to stay the district court action and to refer all claims against it that concerned pre-April 3, 2001, transactions to arbitration, based on an arbitration clause in the 1997 Conditions of Sale document that Midlothian had issued and B-S Steel had signed. B-S Steel contested the validity of the 1997 document. However, in an order dated September 3, 2002, the district court, applying Texas law, held that the document was an enforceable contract based on Midlothian's partial performance in shipping 150 orders to B-S Steel during the applicable period. Further holding that B-S Steel's claims fell within the scope of the arbitration clause, the court granted Midlothian's motion to stay litigation of B-S Steel's pre-April 3, 2001, claims against it and to refer them to arbitration. In response to Midlothian's further motion, the court determined that the 2001 Conditions of Sale document was also enforceable and that B-S Steel's

---

[3](...continued)

> entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws, including [the Robinson-Patman Act] . . . , when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . . In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

15 U.S.C. § 26.

post-April 3, 2001, claims had to be dismissed for improper venue, pursuant to a forum selection clause in the 2001 document.

The other three defendants also moved to stay proceedings against them due to the arbitration provision. However, the district court denied their request on the basis that these three defendants were not parties to the contract containing the arbitration clause. The court observed that "arbitration [between B-S Steel and Midlothian] would not necessarily bind the other three defendants, nor necessarily adjudicate the claims and rights asserted against these three defendants." Appellant's App. Vol. I at 169.

B-S Steel then voluntarily dismissed Midlothian as a defendant in the action and indicated that it would proceed with litigation against the remaining three defendants but would not initiate arbitration with Midlothian. Midlothian, however, filed a Demand for Arbitration with the American Arbitration Association, seeking a declaration that it was not liable to B-S Steel on the antitrust and state law claims that B-S Steel had asserted in district court. In response, B-S Steel submitted counterclaims, which included the same allegations that had been asserted in its amended complaint.[4]

---

[4]B-S Steel later withdrew its tortious interference claim from the arbitration panel's review.

While the arbitration process was underway between B-S Steel and Midlothian, the remaining parties in this lawsuit continued with the discovery process, having reached an agreement that discovery in the two proceedings would be conducted in parallel. Thus, B-S Steel filed the same report quantifying its damages, prepared by an expert witness, Lawrence Redler, both in district court, pursuant to Fed. R. Civ. P. 26(a)(2), and in the arbitration.

Following a nine-day hearing and the parties' submission of post-hearing briefs, the three-person arbitration panel issued a Reasoned Award in favor of Midlothian in November 2003. In its discussion of B-S Steel's Robinson-Patman Act claim, the panel indicated that B-S Steel had met its burden in establishing that Midlothian had engaged in prohibited discriminatory pricing through its incentive programs between October 1999 and the end of 2001. The panel further indicated that Midlothian could not justify the discrimination as a necessary allowance for differences in manufacturing, sales, or delivery costs, as permitted under section 2(a) of the Act, or as a response to a competitor's preexisting offer, as permitted under section 2(b) of the Act. However, the panel concluded that B-S Steel had failed to meet its burden of proving that it had suffered antitrust injury because it could not establish a causal connection between any incentives given to other buyers and any harm to B-S Steel.

The panel then considered whether, even assuming B-S Steel could establish the fact of antitrust injury, B-S Steel would be able to quantify its damages. In conducting this inquiry, the panel explained that "the quantum of proof required to quantify damages in a Clayton Act case is significantly relaxed," but that a factfinder "'may not render a verdict on the basis of speculation or guesswork.'" Reasoned Award at 21, Appellant's App. Vol. IV at 873 (quoting Copper Liquor, Inc. v. Adolph Coors Co., 624 F.2d 575, 580 (5th Cir. 1980)). The panel then examined two damages models as presented in Redler's damages report. The first model, attempting to demonstrate lost profits due to margin squeeze, compared B-S Steel's pre-2000 overall profit margins with its post-June 2000 WFB profit margins, using three different time periods ending in April 2001, December 2001, and June 2003, respectively.[5] Citing a number of flaws, the panel concluded that the analysis using this model lacked "reliability and legitimacy." Id. at 23, Vol. IV at 875. The second model, attempting to demonstrate lost sales over periods beginning in October 1999 and ending in April 2001, December 2001, and December 2002, involved a linear regression analysis based on the monthly sales of WFB by buyers that received incentives, using the monthly purchases of WFB by these buyers as a proxy for that figure,

---

[5]The panel explained that it had requested that the model use these three alternative time periods "due to a question over the permissible temporal scope of the Damage Period." Reasoned Award at 22 n.13, Vol. IV at 874.

and B-S Steel's monthly sales of WFB during the same periods.  The panel considered the analysis under this model to be "inherently flawed and totally unreliable."  Id. at 25, Vol. IV at 877.  Accordingly, the panel concluded that B-S Steel had "failed to meet its evidentiary burden[] on . . . quantification of damages."  Id.

The panel therefore denied B-S Steel treble damages under § 4 of the Clayton Act.  Applying Kansas law, the panel also determined that Midlothian had made fraudulent misrepresentations to B-S Steel but that, again, B-S Steel failed to prove it suffered any damages as a result.  The panel therefore granted Midlothian's request for declaratory relief on these claims.[6]

B-S Steel then filed a motion to vacate the arbitration award in Texas district court.  Meanwhile, Midlothian filed a motion to confirm the arbitration award in the original Kansas district court proceeding.  Presumably because it was no longer a party to that proceeding, Midlothian then voluntarily dismissed its motion and instead filed a new action, seeking an order confirming the arbitration award.  The Kansas district court consolidated Midlothian's action with the original proceeding, and the Texas district court transferred B-S Steel's action there to its Kansas counterpart.  Subsequently, on June 14, 2004, the District

_____

[6]The panel also granted Midlothian relief on B-S Steel's additional claim under the Texas Deceptive Trade Practices Act.  B-S Steel did not raise that claim in its amended complaint, and it is therefore not at issue here.

Court of Kansas confirmed the panel's arbitration award and denied B-S Steel's motion to vacate. B-S Steel of Kan., Inc. v. Tex. Indus., Inc. ("B-S Steel I"), 321 F. Supp. 2d 1214, 1224 (D. Kan. 2004). The court thus dismissed the case transferred from Texas while keeping before it the consolidated case, minus Midlothian as a party. Id.

In the final pretrial order, filed December 17, 2003, B-S Steel claimed that the defendants refused to allow it to make further purchases of WFB after it initiated the present lawsuit and that its last purchase thus occurred in August 2001. In accord with the arbitrators' conclusion that the incentives program ended in December 2001, B-S Steel acknowledged that the defendants had "terminated" their incentives program "[s]hortly after Plaintiff filed its lawsuit," but claimed that the defendants had "then replaced some of the Deals with Favored Buyers, including Steel & Pipe, on terms that were even more favorable to the Favored Buyers and more detrimental to Plaintiff and other service centers." Pretrial Order at 8, Appellant's App. Vol. XII at 3590.

The three remaining defendants in the litigation meanwhile moved for summary judgment, arguing that the arbitration award disposed of B-S Steel's claims for damages under the doctrines of res judicata and collateral estoppel, that any post-April 3, 2001, damages were de minimis, that Redler's damages report was inadmissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.

579 (1993), and that B-S Steel lacked standing to seek injunctive relief. The

district court agreed that the arbitration award should be given preclusive effect in

this case "because the arbitration was akin to a full-blown trial." B-S Steel of

Kan., Inc. v. Tex. Indus., Inc. ("B-S Steel II"), 327 F. Supp. 2d 1252, 1258 (D.

Kan. 2004). It applied res judicata to preclude all of B-S Steel's pre-April 3,

2001, claims, including its tortious interference claim, because they either were or

could have been decided in the arbitration. Id. at 1260-61. The court then

applied collateral estoppel to the arbitrators' conclusion that B-S Steel had failed

to prove an amount of damages, either "before or after April 3, 2001." Id. at

1263. Finally, the court held that B-S Steel lacked standing to proceed with its

claim for injunctive relief because it had failed to show "threatened loss or

[injury] of the type the antitrust laws were designed to prevent." Id. at 1264. The

court thus granted the defendants' motion for summary judgment.[7] Id. at 1265.

B-S Steel appeals, arguing (1) that the district court erred in granting

preclusive effect to the arbitration award because the original arbitration

agreement was unenforceable, (2) that the district court further erred in applying

collateral estoppel to B-S Steel's post-April 3, 2001, claims because the

arbitration did not consider the same issues and did not provide a full and fair

---

[7]The final order granting summary judgment on all claims was entered on
July 29, 2004.

-11-

opportunity to litigate these claims, and (3) that the district court erred in ruling that B-S Steel lacked standing to seek injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26.

## DISCUSSION

"On appeal, we review the district court's grant of summary judgment *de novo*, applying the same legal standards as employed by the district court." Orr v. City of Albuquerque, 417 F.3d 1144, 1148 (10th Cir. 2005). In doing so, we review the record in the light most favorable to the party opposing summary judgment. Neal v. Lewis, 414 F.3d 1244, 1247 (10th Cir. 2005). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. We consider each of B-S Steel's arguments, listed above, in turn.

## I. VALIDITY OF ARBITRATION AGREEMENT

B-S Steel first argues that the district court could not properly accord the arbitration award preclusive effect because the arbitration agreement underlying the award was unenforceable. The appellees suggest that B-S Steel did not appeal the district court's orders confirming the arbitration award and refusing to vacate the award and that B-S Steel thus waived any arguments that might serve to

-12-

undermine the arbitration award's validity. However, B-S Steel was precluded from appealing the district court's order confirming the arbitration award while the consolidated case remained pending. Trinity Broad. Corp. v. Eller, 827 F.2d 673, 675 (10th Cir. 1987) (adopting "the rule that a judgment in a consolidated action that does not dispose of all claims shall not operate as a final, appealable judgment under 28 U.S.C. § 1291"). B-S Steel did appeal from the district court's final judgment. Although it only listed the case number of the original case in its Notice of Appeal, as the district court observed, the case filed by Midlothian seeking confirmation of the award was "substantively consolidated with [the original case] so any argument that the cases should be treated separately is moot." Mem. and Order Denying Mot. to Dismiss (D. Kan. Apr. 28, 2004), Appellant's App. Vol. III at 712-13. Further, in its Docketing Statement, B-S Steel did list all three relevant case numbers and specifically indicated its intent to raise the validity of the arbitration agreement as an issue. Docketing Statement at 1, 5. Because this court "favors deciding cases on the merits as opposed to dismissing them because of minor technical defects," Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co., 119 F.3d 847, 848 (10th Cir. 1997), and because

the appellees had fair notice that B-S Steel intended to raise this issue, we do not deem it waived.[8]

However, we uphold the district court's determination that the arbitration agreement was valid. B-S Steel's sole argument to the contrary rests on the idea that because the earlier 1988 Conditions of Sale document required the signature of both parties to effect a modification, and because the 1997 Conditions of Sale document was not signed by Midlothian, the 1997 document was a failed modification of the 1988 document and thus never went into effect. This argument is flawed because it ignores the prerogative of contracting parties either to waive requirements regarding modification or to substitute an entirely new contract for a previous one, particularly where the modified or new contract is in writing and is valid in all other respects. E.g., Barbara Oil Co. v. Kan. Gas Supply Corp., 827 P.2d 24, 36 (Kan. 1992); Beal Bank, S.S.B. v. Schleider, 124 S.W.3d 640, 652 (Tex. App. 2003); Restatement (Second) of Contracts § 279.[9]

---

[8]We note that B-S Steel has not indicated that it is appealing the district court's order confirming the award. Thus, we need not determine whether this court has jurisdiction over such an appeal. See Denver & Rio Grande W. R.R. Co., 119 F.3d at 848 (holding that this court has jurisdiction when the appellant has filed a docketing statement, indicating an intent to appeal a particular order, within the time for filing an appeal).

[9]While the district court applied a Texas choice of law provision in the 1997 Conditions of Sale when construing the contractual validity of the arbitration agreement, the parties at times refer to Kansas law, perhaps recognizing the logical flaw inherent in applying a contractual choice of law

(continued...)

-14-

Here, it is undisputed that the 1997 Conditions of Sale document contained an integration clause and was signed by B-S Steel, and that both parties adhered to that document in regard to Midlothian's subsequent shipments. We reject the notion that B-S Steel may contest the validity of the 1997 document under these circumstances. Thus, we affirm that the arbitration agreement in the 1997 document is valid and, accordingly, that the district court was not precluded on that basis from applying res judicata and collateral estoppel to the arbitration award.

## II. APPLICATION OF COLLATERAL ESTOPPEL TO POST-APRIL 3, 2001, CLAIMS

B-S Steel next contends that the district court erred in applying the doctrine of collateral estoppel to prevent it from pursuing its post-April 3, 2001, claims against the appellees. In making this argument, B-S Steel invokes "the traditional 'jurisdictional competence' limitation on" preclusion doctrine, suggesting that because the arbitration proceeding had no jurisdiction over claims regarding post-April 3, 2001, transactions, collateral estoppel cannot apply to bar those claims in district court. Appellant's Br. at 26. However, the cases cited by B-S Steel in

---

[9](...continued)
provision before determining whether the underlying contract is valid. We need not consider the matter further, however, as our conclusion would be the same under either Kansas or Texas law.

support of this argument apply this limitation to the doctrine of res judicata, or claim preclusion, which normally bars not only claims that were actually raised in a prior proceeding but also claims that "could have been raised" but were not. Wolf v. Gruntal & Co., 45 F.3d 524, 527 (1st Cir. 1995) (distinguishing res judicata from collateral estoppel on that basis). The concept of jurisdictional competence simply recognizes that a particular claim could not have been raised in the prior proceeding and that res judicata is therefore inapplicable.

In contrast to res judicata, the doctrine of collateral estoppel, also known as issue preclusion, "attaches only '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'" Arizona v. California, 530 U.S. 392, 414 (2000) (quoting Restatement (Second) of Judgments § 27, at 250 (1982)). This circuit has previously applied collateral estoppel to a confirmed arbitration award. Coffey v. Dean Witter Reynolds Inc., 961 F.2d 922, 927-28 (10th Cir. 1992); see 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4475.1, at 514-18. The doctrine precludes a court from reconsidering an issue previously decided in a prior action where

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised

had a full and fair opportunity to litigate the issue in the prior action. Estate of True v. C.I.R., 390 F.3d 1210, 1232 (10th Cir. 2004).

B-S Steel concedes the second and third requirements but argues that the first and fourth requirements are not met here. Specifically, it contends that because the arbitration was restricted to B-S Steel's pre-April 3, 2001, claims, the issues before the arbitration panel and in this lawsuit are not identical. Further, it maintains that it lacked "a full and fair opportunity to litigate issues critical to its post-April 3, 2001 claims." Appellant's Br. at 20. We disagree.

In order to satisfy the first prong, it is necessary, in the arbitration context, to determine "'with clarity and certainty' that the same issues were resolved." Bear Stearns & Co., Inc. v. 1109580 Ontario, Inc., 409 F.3d 87, 91 (2d Cir. 2005). B-S Steel suggests that "[i]t is axiomatic that . . . issues involving conduct in one time period are different than . . . issues based on *different* conduct in a *different* time period." Appellant's Br. at 24. On the other hand, the appellees identify the issue in both the arbitration and the present lawsuit as follows: "[C]ould plaintiff prove [an amount of] damages for any month between October, 1999 and December, 2001 ([under a] "lost sales" [theory]) or October, 1999 and October, 2002 ([under a] "margin squeeze" [theory])." Appellee's Br. at 30. They argue that, because B-S Steel submitted Redler's damages report as evidence in both proceedings, the arbitrators' rejection of the report makes the report inadmissible

-17-

in this case. They then suggest that Redler's report is the only evidence of an amount of damages available and its exclusion thus precludes any quantification of damages.

The district court determined that collateral estoppel was appropriate because "even though the arbitrators did not adjudicate B-S Steel's post April 2001 [Robinson-Patman] Act claim, they did decide that B-S Steel had suffered no damage[s], either before or after April 2001, from price discrimination." B-S Steel II, 327 F. Supp. 2d at 1263. Indeed, the court suggested that the arbitrators had made this determination in respect to "transactions occurring before or after April 3, 2001." Id. The arbitrators, however, never indicated that this was the case. Rather, they explicitly recognized that "the scope of the claims before the panel [is] limited to transactions occurring between the fourth quarter of 1999 and April 3, 2001." Reasoned Award at 7, Appellant's App. Vol. IV at 859. Thus, the "price discrimination" to which their decisions refer must be that which occurred before April 3, 2001. In other words, the arbitrators' finding was that B-S Steel had suffered no damages after April 3, 2001, as a result of Midlothian's pre-April 3, 2001, violations, not that B-S Steel suffered no damages after April 3, 2001, as a result of any violation by Midlothian or the appellees at any

-18-

time.[10]  The question is whether this distinction is significant for purposes of a collateral estoppel analysis.[11]

Other jurisdictions have recognized "the principle that matters adjudged as to one time period are not necessarily an estoppel to other time periods." Int'l Shoe Mach. Corp. v. United Shoe Mach. Corp., 315 F.2d 449, 455 (1st Cir. 1963); see also Harkins Amusement Enters., Inc. v. Harry Nace Co., 890 F.2d 181, 183 (9th Cir. 1989) (rejecting idea that collateral estoppel barred a suit for conspiracy where "the plaintiff alleges conduct that occurred in a different time period"). This is particularly true "when significant new facts grow out of a continuing course of conduct." Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency, 126 F.3d 461, 477 (3d Cir. 1997).  At the same time, a different time period alone does not necessarily preclude application of collateral estoppel. See Pignons S.A. de Macanique v. Polaroid Corp., 701 F.2d 1, 2 (1st Cir. 1983) (applying collateral

---

[10]The district court's mischaracterization appears to result from the assumption that the calculation of damages for a certain month took into account Midlothian's sales either to B-S Steel or to its competitors during that month. This assumption is unwarranted because, as discussed above, the damages models presented measured the latter companies' overall sales and profits during the applicable time period, not their purchases from a particular supplier during that time period.  The latter figure was simply not involved in the calculation.

[11]See 18 Wright, Miller & Cooper, Federal Practice & Procedure § 4417, at 429 (observing that in the situation of "basically continuing activity," where the first action addressed the activity within a specific time period, "[p]reclusion can be justified only by concluding that the first failure to show the facts should prevent a second attempt even as to [a] later [period]," and deeming "the question thus framed . . . one of the most difficult of all issue preclusion questions").

estoppel in a false advertising case based on advertisements published after 1980 where the prior case involved nearly identical advertisements published prior to 1980). The Restatement of Judgments suggests a number of factors that are relevant in distinguishing between situations where collateral estoppel is and is not appropriate in this context:

> Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings?

Restatement (Second) of Judgments § 27 cmt. c. Where these questions can be answered in the affirmative, it is likely that the "issue" involved in the two proceedings is the same.

In the present case, we are concerned with the same claims alleging the same conduct over two consecutive time periods, arbitrarily separated by the effective end date of an arbitration agreement between the parties. It is not necessarily true that the amount of damages sustained as a result of ongoing conduct must remain uniform over the entire period of time the conduct continues. Thus, conceivably, the evidence of damages may differ for different time periods. Here, however, as indicated above, B-S Steel conducted discovery simultaneously in the two proceedings at issue and submitted Redler's damages

-20-

report as evidence of the amount of damages both in the arbitration and in district court. Redler's report made no attempt to disaggregate the damages that it calculated according to whether they were caused by incentive sales that occurred before or after April 3, 2001. Indeed, B-S Steel has not suggested that the damages amounts for the two claims would be different, or, if different, that the disaggregation would require anything beyond dividing the total amount among the number of months in each period. For example, B-S Steel does not contend that the cumulative impact of ongoing incentives to its competitors has exacerbated the damages that it may have sustained as a result of the defendants' post-April 3, 2001, violations, nor does it point to any specific result of post-April 3, 2001, violations that could have led to a type of injury that could not have been contemplated as resulting from pre-April 3, 2001, violations. Cf. Ritchie v. Landau, 475 F.2d 151, 154-55 (2d Cir. 1973) (applying collateral estoppel to preclude the plaintiff from seeking a bonus directly from a company's president where he had failed to obtain the bonus in arbitration with the company and he sought the entire amount of the bonus in both proceedings).

B-S Steel does claim that the arbitration panel refused to consider evidence of transactions that occurred after April 3, 2001, arguing that "[s]ubstantial evidence of injury in the post-April 3, 2001 period was not presented [in the arbitration] because of objections by Midlothian, [and] the arbitrators[']

unwillingness to hear or consider it." Appellant's Br. at 29. However, B-S Steel fails to specify any excluded evidence of post-April 3, 2001, damages sustained as a result of the discriminatory pricing program in effect until December 2001, during the period B-S Steel was undisputedly a purchaser of WFB from the defendants.[12] Rather, it focuses on the arbitrators' exclusion of evidence in connection with new rebate programs that allegedly went into effect after December 2001.

Along the same lines, B-S Steel also argues that new evidence has become available regarding "ongoing Deals" between the defendants and one of its competitors. Appellant's Br. at 33. The new evidence to which B-S Steel refers in its brief all relates to post-December 2001 deals in which the defendants

---

[12]Indeed, it is clear from the Reasoned Award that the arbitrators did allow some evidence, including testimony of two customers, that covered this post-April 3, 2001 period. Reasoned Award at 18-19, Appellant's App. Vol. IV at 870-71 (describing customer evidence). Significantly, the arbitrators observed that B-S Steel simply "did not develop, to any significant degree, empirical data or evidence obtained from either competing steel service centers or from customers, choosing instead to develop its case through" its alternative damages models. Id. at 17, Appellant's App. Vol. IV at 869. The arbitrators indicated that B-S Steel had the necessary data available but suggested that its choice not to use this data might be the result of "'real world' business considerations . . . trump[ing] the litigation process." Id. at 17 n.9. Nevertheless, the arbitrators viewed this omission as raising the "negative inference that, by having evidence available to it and not using it, such evidence might have undermined or defeated its claim." Id. at 18 n.9, Appellant's App. Vol. IV at 870. Here as well, B-S Steel does not suggest that it wishes to present any actual data from the Favored Buyers or any additional evidence from customers in regard to the period at issue.

allegedly engaged in further discriminatory pricing.[13] B-S Steel included the claim that these new deals also violated the Robinson-Patman Act in the district court's final pretrial order.

However, in order to prove a violation of § 2 of the Robinson-Patman Act, 15 U.S.C. § 13, in regard to these new deals, B-S Steel would have to show that the deals granted more favorable prices than those granted to B-S Steel in its reasonably contemporaneous purchases. Motive Parts Warehouse v. Facet Enters., 774 F.2d 380, 389-90 (10th Cir. 1985); see also A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1407 (7th Cir. 1989); Sec. Tire & Rubber Co. v. Gates Rubber Co., 598 F.2d 962, 964 (5th Cir. 1979). While B-S Steel disputes the appellees' claim that it only made a single purchase of 18.9 tons after April 3, 2001, the latest that it alleges making purchases is August 2001. B-S Steel has offered no basis for concluding that these purchases should be deemed reasonably contemporaneous with those made by B-S Steel's competitors after December 2001. See England v. Chrysler Corp., 493 F.2d 269, 272 (9th Cir. 1974) (sixteen-month time span between promotional allowances for

_____

[13]This evidence includes deposition testimony from one of its competitors, Favored Buyer Steel & Pipe Supply Co., that it continued to receive a 3% discount beginning in early 2002, after the appellees terminated the earlier incentives program, because it threatened to cease purchases unless it received the discount. It also includes an affidavit from one of B-S Steel's customers that it has increased purchases from Steel & Pipe during this period, and thus decreased purchases from B-S Steel, because of Steel & Pipe's lower prices.

new or relocated car dealerships defeated Robinson-Patman Act claim); Atalanta Trading Corp. v. FTC, 258 F.2d 365, 371 (2d Cir. 1958) (seven-month period between pork sales not contemporaneous); Maier-Schule GMC, Inc. v. Gen. Motors Corp., 780 F. Supp. 984, 989 (W.D.N.Y. 1991) (no § 2(a) violation where plaintiff failed to show it made purchases in same year alleged violation occurred). But see Fred Meyer, Inc. v. FTC, 359 F.2d 351, 357 (9th Cir. 1966) (concluding that there was substantial evidence supporting FTC's determination that sales over a number of years occurred during the same time period where "the sales are of a single, fairly standardized item, widely sold in the area, and recur frequently during the years involved"), rev'd in part on other grounds, 390 U.S. 341 (1968). This new evidence thus does not add anything significant to B-S Steel's claim for damages resulting from post-April 3, 2001, transactions.

Based on the considerations discussed above, we conclude the issue involved here is identical to the one decided in the arbitration. B-S Steel also argues that it did not have a full and fair opportunity to litigate the issue because of its inability to present to the arbitration panel the evidence of price discrimination that B-S Steel alleges occurred after December 2001. As explained above, however, this new evidence is not significant for purposes of B-S Steel's damages claim and thus did not affect B-S Steel's opportunity to litigate the issue.

B-S Steel's final argument opposing collateral estoppel concerns the nature of arbitration agreements. According to B-S Steel, "the contractual nature of the arbitrators' jurisdiction" should prevent the arbitrators' award from having preclusive effect on "issues and claims outside the Arbitration Period" when such an effect was not intended by the contracting parties. Appellant's Br. at 24. It also contends that because an arbitration is a private rather than a judicial process, the application of doctrines of preclusion does not serve the same interests in judicial economy and avoidance of piecemeal litigation. We do not believe, however, that parties to an arbitration agreement could reasonably intend to allow the losing party to have a second chance to win in court on the very issue that he lost in arbitration. Such a result would undermine the legitimacy of the arbitration award itself, and of the arbitration process. Where, as here, the parties have invested considerable time and resources arbitrating an issue identical to that before a court, and the arbitration panel clearly articulates its findings on that issue, the court may consider this evidence that the parties intended the arbitration to have preclusive effect.[14]

We therefore uphold the district court's summary judgment on B-S Steel's post-April 3, 2001, claims for damages.

---

[14]See G. Richard Shell, Res Judicata and Collateral Estoppel Effects of Commercial Arbitration, 35 UCLA L. Rev. 623, 668 (1988).

## III. STANDING TO CLAIM INJUNCTIVE RELIEF

Finally, B-S Steel argues that the district court erroneously determined that B-S Steel had no standing to seek injunctive relief against the appellees under § 16 of the Clayton Act, 15 U.S.C. § 26, in order to prevent them from "<u>continuing and maintaining</u> illegal WFB pricing conduct." Appellant's Br. at 34. The district court held that B-S Steel lacked standing to pursue injunctive relief because the arbitrators had already determined that it could not show antitrust injury for purposes of its pre-April 3, 2001, damages claim. B-S Steel II, 327 F. Supp. 2d at 1264. B-S Steel argues that this holding is in error because the standards for obtaining treble damages under § 4 and for obtaining injunctive relief under § 16 are different. As discussed below, we agree that the district court's reliance on the arbitration award to resolve whether B-S Steel has antitrust standing for purposes of its request for injunctive relief was in error. However, because B-S Steel no longer purchases steel from the appellees, it has no claim for injunctive relief. We therefore affirm the district court's ruling on this alternative ground.[15]

---

[15]See Miller v. Auto. Club of N.M., Inc., 420 F.3d 1098, 1127-28 (10th Cir. 2005) ("[W]e may affirm the judgment of the district court on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." (internal quotation omitted)).

-26-

Designed to determine "whether the plaintiff is a proper party to bring a private antitrust action," the standing inquiry in antitrust law requires a court "to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." Associated Gen. Contractors v. Carpenters, 459 U.S. 519, 535 & n.31 (1983) (observing that "the focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine"). The inquiry "applies to actions arising under both section 4 and section 16 of the Clayton Act." Cent. Nat'l Bank v. Rainbolt, 720 F.2d 1183, 1186 (10th Cir. 1983); see Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 111 (1986) ("[U]nder both § 16 and § 4 the plaintiff must . . . allege an injury of the type the antitrust laws were designed to prevent."). However, "[s]tanding analysis under section 16 is not identical to that for section 4." McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 856 (3d Cir. 1996). Rather, "[s]ection 16 has been applied more expansively, both because its language is less restrictive than that of § 4 . . . and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy." Id. (internal quotation omitted); see also Campos v. Ticketmaster Corp., 140 F.3d 1166, 1172 (8th Cir. 1998) (rejecting the notion of "an inflexible rule that no antitrust plaintiff may seek injunctive relief unless he may also seek damages").

The Supreme Court has expressly stated that injunctive relief under § 16 is "available even though the plaintiff has not yet suffered actual injury." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130 (1969); see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic, 152 F.3d 588, 592 (7th Cir. 1998). Rather, a plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Zenith Radio Corp., 395 U.S. at 130. Moreover, the Court has directed that "[§] 16 should be construed and applied," keeping in mind that its intent is "not merely to provide private relief, but . . . to serve as well the high purpose of enforcing the antitrust laws." Id. at 130-31.

In order to make the necessary "threshold showing of entitlement to injunctive relief," a plaintiff must show "a threat of 'antitrust injury,'" which is described as "injury 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" Consol. Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 257 (2d Cir. 1989) (quoting Cargill, 479 U.S. at 113) (further quotation omitted); see also Glen Holly Entm't Inc. v. Tektronix Inc., 343 F.3d 1000, 1007 (9th Cir. 2003). "[T]he antitrust injury requirement . . . . ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private

-28-

plaintiffs for . . . equitable relief." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342 (1990).

The showing of threatened antitrust injury is "not always sufficient to establish antitrust standing." Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co., 826 F.2d 1235, 1240 (3d Cir. 1987). "Once [the threat of] antitrust injury has been demonstrated by a causal relationship between the [threatened] harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who [may] suffer[] loss." Id.; see also Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 437 (2d Cir. 2005). However, "because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries," a court need not consider those dangers when making the determination. Cargill, 479 U.S. at 111 n.6. Accordingly, as recognized by the district court, this circuit has specified a number of factors relevant to the inquiry, which, as concerns injunctive relief, include

> (1) the causal connection between the antitrust violation and the plaintiff's [potential] injury; (2) the defendant's intent or motivation; (3) the nature of the plaintiff's [potential] injury—i.e., whether it is one intended to be redressed by the antitrust laws; (4) the directness or the indirectness of the connection between the plaintiff's [potential] injury and the market restraint resulting from the alleged antitrust violation.

-29-

Roman v. Cessna Aircraft Co., 55 F.3d 542, 543 (10th Cir. 1995) (citing Sharp v. United Airlines, Inc., 967 F.2d 404, 406-07 (10th Cir. 1992)).

In a summary judgment determination, the initial question is therefore "whether plaintiff has raised a genuine issue of material fact sufficient to show a threat of antitrust injury" if defendants engage in future violations of the type alleged. R.C. Bigelow, Inc. v. Unilever N.V., 867 F.2d 102, 107 (2d Cir. 1989). The district court answered this question in the negative because the arbitrators had already determined that B-S Steel could not show actual injury based on pre-April 3, 2001, violations. B-S Steel II, 327 F. Supp. 2d at 1264. The court reasoned that because no injury resulted from the pre-April 3, 2001, violations, the price discrimination for which B-S Steel sought an injunction was "not the type of injury that would entitle a plaintiff to compensation if the injury actually occurred." Id. at 1270. This conclusion is in error, however, because it ignores the distinction outlined above between showing that antitrust injury actually occurred in the past and showing that it might occur in the future. Indeed, as recognized above, B-S Steel offered different evidence regarding injury for the period after December 2001. Thus, simply because the arbitrators concluded that B-S Steel failed to meet its evidentiary burden in regard to past violations does not mean, as a matter of law, that it would be impossible for B-S Steel to show a threat of future injury. See H.L. Hayden Co. v. Siemens Med. Sys., Inc., 879 F.2d

1005, 1022 (2d Cir. 1989) (holding that the court's determination that the "plaintiff failed to make a showing of antitrust injury adequate" to allow treble damages "does not provide a basis to dismiss plaintiffs' Robinson-Patman Act claim insofar as it seeks [injunctive] relief"). The arbitrators' Reasoned Award therefore cannot provide a basis for denying B-S Steel injunctive relief.

Nevertheless, we are precluded from reversing the district court's summary judgment on this ground because B-S Steel is no longer a purchaser of WFB from the appellees and has failed to show any possibility that it might resume such purchases in the future. As indicated above, a plaintiff must have made reasonably contemporaneous purchases in order to show a violation of § 2(a) of the Robinson-Patman Act. Without such purchases, there can be no causal connection between the threatened injury that B-S Steel alleges and a violation of § 2(a). Nor would any such injury be one that this provision could remedy in practice. A consideration of the factors listed above thus militates against recognizing standing here. See H.L. Hayden Co., 879 F.2d at 1022 (holding that "[s]ince [the defendant] is no longer selling to [plaintiffs], as is its right, there is no danger that it will sell to them on discriminatory terms in violation of 15 U.S.C. § 13 (1982), and accordingly no basis for a Robinson-Patman injunction").

B-S Steel points to an Eighth Circuit case as recognizing that a plaintiff can seek damages or injunctive relief after it ceases purchasing the defendant's

product as long as the "plaintiff has purchaser status at some time while price discrimination is ongoing." Appellant's Reply Br. at 8. That case, Reeder-Simco GMC, Inc. v. Volvo GM Heavy Truck Corp., 374 F.3d 701 (8th Cir. 2004), has subsequently been reversed by the Supreme Court on other grounds. Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc., 126 S. Ct. 860 (2006). Moreover, to the extent that the Eighth Circuit's opinion remains good law, we do not believe it supports B-S Steel's contention. In Reeder-Simco, the plaintiff submitted a damages calculation that spanned the entire four-year period during which price discrimination was alleged to have occurred, even though it had made only one three-item purchase from the defendant in the first year of that period. 374 F.3d at 710-11, 715. The court rejected the defendant's challenge to the jury's damages award on that basis, citing the Supreme Court for the proposition that a damages determination is not calculated merely in relation to the excess a plaintiff paid for its purchase, over the amount paid by a favored buyer. Id. at 714 (citing J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 565 (1981)). In our view, the Eighth Circuit's holding on that issue merely approves the use of a lost sales damages model in order to calculate damages. It has no evident implication for a plaintiff's standing to seek injunctive relief where there is no indication the plaintiff will continue purchasing from the defendant.

-32-

B-S Steel also points to a 1951 Fifth Circuit case, which held that the plaintiff was not required to make purchases "upon such [discriminatory] terms in order to attain the status of a competing purchaser under the [Robinson-Patman] Act, as its failure to do so was directly attributable to defendant's own discriminatory practice." Am. Can Co. v. Bruce's Juices, 187 F.2d 919, 924 (5th Cir. 1951). We need not consider whether to adopt such a rule here, however, because B-S Steel has not alleged that it stopped purchasing WFB from the appellees due to their discriminatory pricing. Rather, the pretrial order indicates B-S Steel's contention that the appellees refused to sell to B-S Steel in retaliation for B-S Steel's initiation of this lawsuit.[16]

B-S Steel finally argues that, if we fail to recognize that it has antitrust standing in these circumstances, "once a customer complains about price discrimination, Defendants can simply cease selling to that customer and effectively cut off its ability to seek injunctive relief." Appellant's Reply Br. at 6. However, we understand this to be the nature of § 2(a) of the Robinson-Patman Act. That provision states that "nothing herein contained shall prevent

---

[16]As B-S Steel's counsel at oral argument recognized, the testimony in the record is conflicting in regard to whether B-S Steel or Midlothian first refused to deal with the other. However, B-S Steel's counsel also conceded that B-S Steel submitted orders to Midlothian that Midlothian refused to fill. In any case, our perception of B-S Steel's claims must be governed by the pretrial order. See Fed. R. Civ. P. 16(e); McKenzie v. Benton, 388 F.3d 1342, 1349 n.2 (10th Cir. 2004).

persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade." 15 U.S.C. § 13(a). It is well established that "a refusal to deal" simply "does not fall within the proscription of section 2(a)" of the Robinson-Patman Act. Black Gold, Ltd. v. Rockwool Indus., Inc., 729 F.2d 676, 682 (10th Cir. 1984). B-S Steel has not alleged a violation of any other antitrust provision that might provide relief for a refusal to deal in certain circumstances. See id. (indicating that a refusal to deal "may be actionable under other antitrust provisions").

We therefore conclude that B-S Steel lacks antitrust standing to pursue injunctive relief in this case and affirm the district court's grant of summary judgment on this issue.

## CONCLUSION

For the foregoing reasons, the district court's summary judgment order is AFFIRMED.